# COURT OF APPEALS OF TEXAS.

## AUSTIN TERM, 1888.

---

### No. 6108.

### JIM JONES *v.* THE STATE.

1. SHERIFF—SERVICE OF PROCESS.—The laws of this State do not authorize a sheriff to execute a warrant of arrest or a capias beyond the limits of the county of which he is sheriff.

2. HOMICIDE IN THE PREVENTION OF ARREST.—Homicide to prevent arrest, even though the attempted arrest be lawful, is justifiable if the arrest is attempted in such a wanton and menacing manner as to threaten the accused with loss of life or serious bodily harm.

3. SAME—CHARGE OF THE COURT.—A killing committed in the prevention of an illegal arrest is ordinarily a homicide of no higher degree than manslaughter. See the opinion for a state of case to which the foregoing rules apply; wherefore, the omission of the trial court to give them in charge to the jury was material error.

4. SAME—SELF DEFENSE.—See the opinion and the statement of the case for proof under which the charge of the court erroneously made the accused's right of self defense depend upon whether or not he was the person named in the capias, and whether the deceased was making, or had made, an unlawful attack upon him.

5. SAME.—See the statement of the case for a special charge, which, being substantially correct and responding to the proof, should have been given.

APPEAL from the District Court of San Saba. Tried below before the Hon. A. W. Moursund.

The conviction in this case was in the second degree for the murder of T. H. Nowlin, in San Saba county, Texas, on the fifth day of April, 1888. The penalty assessed by the jury was a term of twenty-four years in the penitentiary.

Lee Peck was the first witness for the State. He testified that he lived in Llano county, Texas, and was well acquainted with Thomas H. Nowlin at the time that the latter was killed

1

by the defendant. The killing of Nowlin occurred a little after sun rise on the morning of April 5, 1888, at the house of the defendant, in San Saba county, Texas. Nowlin, at the time of his death, was an acting deputy sheriff of Llano county, Texas. The purpose of Nowlin and witness in going to the defendant's house on that fatal morning was to arrest the defendant under the process hereinafter set out. They reached the defendant's house about sun rise, the said house being situated in San Saba county, about three quarters of a mile from the Llano county line. Nowlin hallooed to the defendant from a point about thirty feet distant from the door. The witness then heard some person whom he took to be Mrs. Jones, wake the defendant. Defendant then called to Nowlin that he would be out in a minute, and in a short time he opened the door and appeared with a double barreled shotgun in his hand. Nowlin said to him: "Jim, we have got a paper for you"—calling the paper by a name which the witness could not now remember. Defendant replied: "All right; I thought it was a mob (or a d—d mob), as some of the people around here have been accusing me of stealing horses." During this conversation the witness and Nowlin dismounted from their horses and walked up to the door in which the defendant was standing. Defendant then asked to be shown the paper, and Nowlin asked him: "Will you read it, or shall I read it to you?" Defendant replied that he would read it, and Nowlin handed him the paper. Nowlin was then standing near the defendant, who was standing in the door. The witness standing a few steps off. Defendant read the paper until he came to the words "Jeff Davis county," the first word of which was blotched. He then took a step toward Nowlin and asked him what the word was. Nowlin told him, and he stepped back and continued to read for a minute, when he suddenly raised his gun and fired upon Nowlin. Nowlin, who had quietly drawn his pistol from the scabbard while defendant was reading the paper, raised his hand about the time that defendant raised his gun, and fired upon defendant almost simultaneously with defendant's shot. In fact, the shots were fired so near the same point of time that witness could not positively say which of the parties fired the first shot. Nowlin staggered to a point fifteen or twenty feet distant from the door, and there fell. About the time he struck the ground he, fired a second shot at the defendant. When he pulled his pistol Nowlin held it in his hand, down by his side, and did not

raise nor attempt to raise it until defendant began to raise his gun. Witness did not think that the defendant saw Nowlin draw his pistol.

Defendant and Nowlin were standing four or five feet apart when the first shots were fired. Defendant at that time was standing in the southeast inside corner of the house, about three feet from the door. Nowlin was standing just outside, facing the door, and about a foot and a half from it. Witness was standing between three and four feet to the right of Nowlin, outside the house. The witness left immediately after the shooting, to get help. As he started off he met Mr. Wright, who lived near by. Witness went on to Tom Hibdon's camp, where he found the said Hibdon, Henry Nowlin and a youth named John Hinton. Witness, who had now been gone between twenty and thirty minutes, returned with the said parties to the place of the shooting. Witness then left to get Doctor Anderson, and met him on his way to the scene of the tragedy. He returned with the doctor and found that Tom Nowlin had been moved into the defendant's house and placed on the bed. Tom Nowlin died about three hours after he was shot. Defendant had "the paper" when the witness last saw it. Defendant's house consisted of a single room with a door in the north and south sides, and a chimney on the east end.

Cross examined, the witness said he was armed with a gun at the time of the killing, but was thrown off his guard by the conduct of defendant. When defendant said that he first thought he was called by a mob, Nowlin replied: "No, Jim; we have legal papers for you." When he approached the door, witness saw somebody, whom he took to be Mrs. Jones, sitting on the side of the bed inside the house. She passed out at the back door just after the shooting. The conversation between defendant and Nowlin, just prior to the shooting, indicated no ill feeling. Nowlin's last shot was fired after he fell. Witness could not say where the balls from Nowlin's pistol struck. Witness had not talked with J. T. Simpson about this killing. He did not know that defendant was ever in Jeff Davis county, nor did he know that he was the identical Jones referred to in the writ. He, however, identified the writ now offered in evidence as the paper by virtue of which Nowlin attempted to arrest defendant, and which he last saw in the hands of the defendant:

The said paper reads as follows:

### CAPIAS.

The State of Texas,

*To any Sheriff of the State of Texas, greeting:*

You are hereby commanded to arrest Jim Jones, and him safely keep so that you have him before the Honorable District Court of Jeff Davis county, in said State, at the court house of said in the town of Fort Davis, on the second Monday before the first Monday in September, A. D. 1888, then and there to answer the State of Texas upon an indictment pending in said court charging him with the offense of theft of cattle.

Herein fail not, but due return hereof make to this court on the 20th day of August, 1888. Witness my signature and official seal, on this the 17th day of March, 1888.

Jas. Stewart<br>Clk D. C. Jeff Davis Co. Texas.

Indorsements: File No. 20—The State of Texas v. Jim Jones. Capias—Issued 17th day of March, 1888. Jas. Stewart, clerk of the Dist. Ct of Jeff Davis county, Texas. The amount of bail fixed by the court in this case is $500.

Jas. Stewart, Clerk Dist. Ct. Jeff Davis Co.

Thomas Hibdon was the next witness for the State. He testified that he was in camp near defendant's house at the time of the fatal shooting of Nowlin. He went from his said camp to the defendant's house with Lee Peck, Henry Nowlin and the youth John Hinton, and found Tom Nowlin in front of the house, lying back down on the ground. Witness pulled down the pants of Nowlin and found that he had been shot through the lower part of the body, the charge entering at the base of the back bone and passing out at the left hip. Two buck shot and a turkey shot were taken from Tom Nowlin's body by Doctor Anderson in the presence of the witness. Mr. Wright was either at the house when the witness arrived or came there soon afterward. Upon his arrival the witness found Mrs. Jones at the house, but did not see defendant. Nowlin was taken into defendant's house and placed on the bed, where he died between three and four hours after he was shot. Nowlin said repeatedly before he died that he could not recover and that he would surely die, and asked for his wife. Between a half and three-quarters of an hour before he died he exclaimed: "O Lord! I am bound to die! I can not stand it long. I want to see my wife." Witness then asked him who shot him, and

he replied that Jim Jones did.  Doctor Anderson then asked him how it happened, and he replied that Jim Jones got the advantage of him and shot him.  Doctor Anderson then asked him if he read the writ to defendant before the latter shot him, and he replied in the affirmative.  The doctor then asked him what the defendant said at the time of the shooting, and he replied that the defendant did not say anything, but stepped back and shot him.  Doctor Anderson then asked him how often the defendant fired, and he replied that the defendant fired two shots.  He then said, in reply to Doctor Anderson's question, that the defendant fired the first shot.  Witness then asked him if there were any empty chambers in his pistol when he came to the defendant's house on that morning.  He replied that two of the chambers were empty.  When witness examined Nowlin's pistol on that morning he found that the three chambers to the left of the hammer were empty.  The hammer was caught on the next chamber and the cylinder would not revolve, and witness did not ascertain whether that chamber was loaded or not.  The defendant's house, at which the tragedy was enacted, was situated in San Saba county, between a half and three quarters of a mile distant from the Llano county line.  Defendant had lived there for several months, and he knew Nowlin, who lived less than two miles from him.  Nowlin had been acting as deputy sheriff of Llano county a month or more at the time of the shooting.  The witness could not say that defendant knew that Nowlin was a deputy sheriff, but thought that he must have been aware of the fact, as it was notorious in the neighborhood, and Nowlin had spent much time in the immediate vicinity, serving process and performing other official work.  Witness did not know that defendant was ever in Jeff Davis county, or that he was the identical Jim Jones named in the capias attempted to be executed by Nowlin.

Caldwell Roberts was the next witness for the State.  He testified that he was the sheriff of Llano county, and held that office at the time of the tragedy.  Tom Nowlin was a deputy sheriff of Llano county, appointed by the witness in writing. The capias in evidence came to the hands of the witness about the first day of April, 1888, and witness delivered it to Tom Nowlin and directed him to arrest the defendant by virtue of the same.  At this point the State offered in evidence the written appointment or deputation of Tom Nowlin as deputy sheriff, and it was admitted despite the objection of defendant that it

appeared upon the face of the same that it had never been recorded, and that the oath prescribed by law had never been taken and subscribed by Nowlin.

On his cross examination, this witness said that he appointed Nowlin of his own motion, and not at the instance of anybody else. He afterwards heard of complaints about the said appointment. The witness did not know, as a matter of fact, that the defendant was ever in Jeff Davis county, nor that he was the identical Jones named in the capias. He had a description of the Jones named in the capias, and ordered the arrest of the defendant by that description. Witness hunted defendant after the killing of Nowlin, but failed to find him.

Doctor R. B. Anderson testified, for the State, that he reached Tom Nowlin, at defendant's house, about two hours before his death, and found him suffering from a gun shot wound. The charge entered the back, four or five inches above the base of the spinal column, some of the shot passing through in front, and others lodging in front of the right hip. The orifice at the entrance of the charge was about an inch in circumference. The lower end of the spinal column was cut nearly in two. Nowlin asked witness the nature of the wound, and witness told him that it was very serious. He (Nowlin) then said that he was bound to die. Witness then asked him how he came to get shot. He replied: "Jones got the advantage of me when I was not thinking about it, and shot me." The witness then asked him who fired the first shot, and he replied: "Jones shot first, but the shots were almost together." Nowlin's spinal column was broken at a point below the spinal cord, and the wound, although fatal in its nature, did not disable his arms and legs pending his dissolution. Nowlin, however, could not have stood erect nor walked after receiving the shot, but doubtless could have staggered fifteen or twenty feet before falling. Witness did not see the defendant after the shooting until after his arrest.

W. D. Wright testified, for the State, that he lived about two hundred and fifty steps southeast from the house of the defendant. He heard the fatal shooting on the morning of April 5, 1888, and went at once to the defendant's house. He found the defendant and Mrs. Jones inside of the house and Thomas Nowlin outside, lying, back down, on the ground. The point at which he lay was fifteen feet and seven inches distant from the door of defendant's house. Nowlin lay with his feet point-

ing to the door of defendant's house. Defendant remained at the house about five minutes after the witne-s arrived, and then left, going south toward the house of Mr. John Hinton. Witness next saw him on this trial. Defendant took his double barreled shot gun with him. Mrs. Jones, after the flight of the defendant, spent part of the time at witness's house and part at the house of her father.

Cross examined, the witness said that the capias in evidence, which was now exhibited to him, was the same paper which he found lying open on the ground near Nowlin's hand. The witness heard three shots fired, two of which were fired from a pistol or Winchester rifle and one from a shot gun. The first shot was fired from a pistol. Within one and a half seconds thereafter the shot gun was fired, and the second pistol shot was fired three or four seconds later. Witness and Sid Gatliff found a bullet in the north wall of the house on the inside, about twenty-two inches from the northeast corner, and about five feet ten inches from the floor, which was a dirt floor. Another bullet struck the east wall, southeast of the chimney, passed through a crack and struck the chimney. The point at which the last mentioned bullet passed through the crack was between ten and eleven feet from the floor or ground. When witness reached the defendant's house he ascertained that the defendant had received a slight wound on the shoulder.

On his re-direct examination, the witness stated that his wife and the wife of the defendant were sisters. He denied that, in the town of San Saba, on the morning of this trial, he told Mr. Baldwin that the shots were fired so nearly together that he was unable to tell which was fired first, but that he thought that the report of the shot gun was the first he heard. He did tell Baldwin that the shots were fired very nearly together, but nothing else.

Jack Hamilton testified, for the State, that he was one of a party which searched for the defendant on the day of, but after, the killing of Nowlin. They did not find him.

W. T. Woodward testified that he and others, on April 8, 1888, found the defendant in the loft of a barn on Frank Gray's place, and arrested him. He was then unarmed. Frank Gray lived about three miles from the defendant's house.

Lee Peck, recalled by the State, testified that the defendant neither questioned Nowlin's authority to arrest him, nor denied that he was the Jim Jones named in the capias.

Doctor George P. Holman testified, for the State, that he was called to the jail on the day of defendant's arrest, to dress a superficial wound on the defendant's shoulder. That wound showed that it was inflicted by a ball fired from a pistol in the hands of some person who was either in the act of falling, or was lying on the ground. It could not have been fired by a man standing erect.

Mr. Baldwin testified, for the State, that in a conversation which occurred at witness's house on the morning of this trial, W. D. Wright stated that the first and second shots were fired so nearly together, and were so nearly blended, that he could not testify as to which was fired first, but that he would give it as his opinion that the shot gun was the first fired.

The State closed.

The defense read in evidence the deputation or written appointment of Thomas Nowlin as deputy sheriff of Llano county, to show that the certificate of acknowledgment thereto, the oath of office, and the indorsement of record, were all in blank, and that therefore the appointment had never been legally acknowledged by the sheriff, nor recorded by the clerk, and that Nowlin had never taken the prescribed oath of office.

Henry Birdwell testified, for the defense, that early on the morning of April 5, 1888, he was near Worsham's place on Cold creek, less than one and a half miles from defendant's house, and heard three shots fired at or about defendant's house. The first shot was fired from a pistol or rifle, the second from a shot gun, and the third from a pistol. Considerable timber and a rough country intervened between the houses of the defendant and Worsham.

Mrs. E. V. Jones, the wife of the defendant, testified in his behalf that she was at home and saw the fatal difficulty between her husband and Tom Nowlin, on the morning of April 5, 1888. The witness and defendant were in bed, the defendant being asleep, when about sun rise some parties came to the house and hallooed to the defendant from a point on the outside near the door. Witness aroused her husband and told him that somebody was calling him. Defendant called to the parties outside that he would be out in a minute. He then got up, dressed, and went to the door, taking his double barreled shot gun with him. He then opened the door, and the witness, who was sitting on the side of the bed, saw Mr. Tom Nowlin and Mr. Lee Peck outside, near the house. Nowlin said to the de-

fendant: "Jim., I have an attachment for you as a witness, from Llano county." Defendant replied: "That is all right; I thought you was a damned mob."

During the progress of this conversation Nowlin and Peck walked to a point very near the door, Nowlin taking his position almost directly in front of the door, and Mr. Peck his position four or five feet to the right of Nowlin and east of the door. Defendant asked Nowlin to show his papers. Nowlin produced a paper and asked: "Shall I read it to you, or will you read it?" Defendant replied: "I can read it." Thereupon Nowlin handed the paper to defendant, who read it until he reached a word he could not decipher, when he remarked to Nowlin: "Here is a word I can't make out." Nowlin remarked that he could, when defendant made one step toward him, handed him the paper and stepped back, and Nowlin finished reading the paper. During this time the defendant stood with his gun in his right hand, clasping it about the locks and the muzzle resting on his foot. When Nowlin finished reading the paper the defendant remarked to him: "Tom, I will not go with you." Nowlin replied instantly: "You won't!" threw his pistol up and fired upon defendant, the ball taking effect in defendant's shoulder. As soon thereafter as he could the defendant threw up his gun and fired at Nowlin. Witness then sprang from her bed, and as she did so Nowlin fired a second shot. Discovering at once that defendant was wounded, witness rushed to him, but he pushed her back, with the question: "Ain't they all around the house?"

Witness then ran out at the north door, and saw Mr. Peck up the fence about twenty yards, about half bent, and looking back over his shoulder. As soon as he saw witness, Peck threw his gun down on her, and she ran back into the house. Just as she got into the house the defendant, who was standing in the floor, looked through the door and saw Nowlin lying on the ground. He then remarked to witness: "Eva, I am sorry I had to shoot Tom." Five minutes later the defendant left, and witness went to Mr. Nowlin and asked if she could do anything for him. To this inquiry he made no reply. Witness then asked him if he wanted some water, and he replied in the affirmative. Witness then got him a drink of water, and was bathing his head when Mr. Hibdon and Henry Nowlin arrived. Those two gentlemen moved the wounded man into witness's house, and witness went to the house of her sister, Mrs.

Wright, who lived near by. When the witness reached Nowlin she saw the paper referred to in her testimony lying open on the ground near his hand.

The defense closed.

James Kuykendall testified, for the State, in rebuttal, that the Worsham place, near which the witness Birdwell claimed to have been when he heard the fatal shots, was between a mile and three-quarters and two miles distant from the defendant's house, where the shooting occurred, and that the intervening country was considerably timbered.

The charge requested of the court and referred to in the fifth head note, reads as follows: * * * "I charge you that if Jim Jones, defendant in this case, believed, and had reasonable ground to believe, or for such belief, at the time he shot the deceased, Tom Nowlin (if you find he shot him), that he, defendant Jim Jones, was being unlawfully arrested, that is, arrested without lawful authority, and that the life or person of him, defendant Jim Jones, was in immediate serious danger thereby, and the acts done by the defendant Jim Jones were necessary to prevent such unlawful arrest of him, the said Jim Jones, and without a resort to such extremity the said unlawful arrest could not have been prevented, and the deceased had not, in fact, any lawful authority to make such arrest, then the homicide was in law justifiable, and you will acquit the defendant."

The motion for new trial raised the questions discussed in the opinion.

*W. A. H. Miller*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

Hurt, Judge. This is a conviction for murder in the second degree, with the penalty fixed at confinement in the penitentiary for twenty-four years.

The appellant, Jones, lived in San Saba county. Thomas H. Nowlin lived in, and was deputy sheriff for, Llano county.

The following capias was issued by the clerk of Jeff Davis county:

"The State of Texas: To any Sheriff of Texas, Greeting:" Then follows the command to arrest Jim Jones upon a charge by indictment for theft of cattle in Jeff Davis county. This

capias came to the hands of Caldwell Roberts, sheriff of Llano county, who, on the fourth or fifth day before the homicide, gave it to Nowlin, his deputy, with orders to go and arrest the appellant.

On the fifth day of April, 1888, Nowlin, accompanied by Lee Peck, just after sun rise, went to the house of appellant to execute the capias. Jones and wife were in bed. Nowlin hallooed. Jones, saying "he would be there in a moment," soon opened the door with a shot gun in his hand.

Peck, relating the facts attending the homicide, testified: "Nowlin said: 'Jim, we have got a paper for you,' (calling it by some name, I do not recollect what.) Defendant said 'that is all right; I thought it was a mob,' or 'damn mob.' He also said that some of the people around there had been accusing him of horse stealing. Jones said, 'let me see the papers.' Whilst the conversation was going on, Nowlin and myself had dismounted and walked up to the door. Nowlin said 'shall I read the paper, or shall you read it?' Defendant said he would read it. Defendant then took the paper from Nowlin, who handed it to him, and read until he got down to the words 'Jeff Davis county.' The word 'Jeff' was blotched, and defendant stepped up to Nowlin and asked him what it was. Nowlin told him, and defendant stepped back and read on a while, then suddenly raised his gun and fired. I saw him raising his gun. Nowlin commenced raising his pistol, and they both fired about the same time—can't say which fired first. While defendant was reading the paper, Nowlin pulled out his pistol and held it down by his side. Don't think Jones saw Nowlin when Nowlin pulled out his pistol. Nowlin fired two shots—the first so close together with Jones that I could not tell who fired first. Nowlin fired his second shot after he had fallen."

W. D. Wright, a witness for the State, testified that the pistol shot was fired first. "I heard one pistol shot before I heard the shot gun, and one pistol shot after." "I heard the first pistol shot from one to one and a half seconds before I heard the shot gun. I heard the second pistol shot from three to four seconds after I heard the shot gun." "Defendant was wounded slightly in the shoulder." "I am a brother-in-law of Jones." "I was about one hundred and ten steps from defendant's house when the shots were fired."

The wife of defendant testified that she and her husband were in bed when the parties came to the house; that she waked

her husband and remained on the bed when he went to the door. "Nowlin handed the defendant a paper and he read a part of it, and said to Mr. Nowlin: 'Tom, here is a word I can't make out.' Mr. Nowlin said he could. Defendant then stepped one step and handed the paper to Nowlin. Defendant stepped back one step and Nowlin finished reading the paper. Defendant was standing, and had been all the time, with his gun in his right hand, holding it about the lock, the muzzle resting on his foot. When Mr. Nowlin finished reading the paper, defendant spoke and said: "Tom, I will not go with you." As defendant said that, Mr. Nowlin said: "You won't?" and threw his pistol up and fired, hitting defendant on the shoulder. As soon as defendant could, he threw his gun up with his right hand and fired. At the firing of defendant's gun I jumped out of bed, and just after I did so Mr. Nowlin fired a second shot."

Henry Birdwell testified that he heard the three shots—two rifle or pistol shots and one a shot gun—the pistol or rifle shot first, then the shot gun, and then the rifle or pistol again. He was about a mile and a quarter from defendant's house.

In his dying declarations the deceased stated that the defendant fired first, but that the shots were almost together. The above is a sufficient statement of the facts to present the points raised on the charge of the court.

At common law, a sheriff has no jurisdiction beyond the borders of his county. The Constitution of this State provides for this officer, giving to the Legislature the right to prescribe his duties. We have searched the statutes carefully, but find no act giving jurisdiction to the sheriff to serve a capias beyond the limits of his county. Hence, the attempted arrest in this case was unlawful.

What, therefore, are the rules of law applicable to a homicide committed in the prevention of an illegal arrest?

1. Whether the arrest be legal or not, the power to arrest may be exercised in such a wanton and menacing a manner as to threaten the accused with loss of life or some bodily harm. In such a case, though the attempted arrest was lawful, the killing would be justifiable.

2. "Though a man will not be justifiable, then, if he kill in defense against an illegal arrest of an ordinary character (not such as is mentioned in the first rule), yet the law sets such a high value upon the liberty of the citizen that an attempt to arrest him is esteemed a great provocation, such as will reduce a

killing in the resisting of such an arrest to manslaughter. This principle is declared in Wales v. The State, 26 Alabama, 31; and Commonwealth v. Drew, 4 Mississippi, 391; and is well established, both in England and in this country." (Rex v. Curvan, 1 Moody C. C., 132; Buckner's case, Slyle, 467; Tooley's case, 2 Ld. Raymond, 312; 1 Hale P. C., 457; Foster, 312, sec. 9; Reg. v. Phelps, 1 Car. & Marsh, 180; Stockley's case, 1 East. P. C., 310; Ferris's case, C. C., sec. 71; Roberts v. The State, 14 Mo., 146; Comm. v. Thompson, 1 Moody C. C., 80; Comm. v. Carey, 12 Cush., 246; The State v. Oliver, 2 Houston, Del., 604; Tacket v. The State, 3 Yerg., 392; Galvin v. The State, 6 Cold., Tenn., 291.)

Testing the charge of the court by these rules, it will be found clearly wrong, because it fails to submit to the jury these principles of law for their guidance in determining whether the defendant was guilty at all, and, if guilty, of what grade of offense.

In one paragraph of the charge appellant's right of self defense is made to hinge upon whether he was the person named in the capias, and the further fact that deceased was making or had made an *unlawful* attack upon him, reasonably calculated to create in a man of ordinary mind a belief that deceased was about to inflict on him death or serious bodily harm. We think that the appellant's right to kill would be complete, under the above state of case, whether he was the person named in the warrant or not.

The first charge requested by counsel for appellant was substantially correct, and should have been given. The court should have submitted to the jury the principle of law contained in the rules above given. This was absolutely required by the facts of the case.

There are other matters contained in the record of a very serious character, but, as they will not occur on another trial, they will not be noticed.

The judgment will be reversed and the cause remanded.

*Reversed and remanded.*