FRANK ROBERSON, PLAINTIFF IN ERROR, VS. THE STATE OF FLORIDA, DEFENDANT IN ERROR.

Criminal Law—Arrest Without Warrant—Homicide of Officer Making Unlawful Arrest.

1. The carrying of arms in a quiet, peaceable, and ordinary manner, but concealed on or about the person, is not either a breach of the peace or *malum in se.* Neither does it, of itself, tend to a breach of the peace, but it becomes a misdemeanor only because it is prohibited by statute. The statute does not declare it to be a breach of the peace, nor does the statute authorize an arrest without warrant for its infraction.

2. An officer cannot, under the laws of Florida, lawfully arrest a person without a warrant for the bare crime of carrying concealed weapons, whether he knows it of his own knowledge, or is informed of it by others, and whether it occurs in or out

of his presence, unless it is done in such manner or under such circumstances as, in the presence of the officer, to create, threaten, or amount to a breach of the peace; and even in the latter case the arrest would be authorized, not from the *bare fact of carrying concealed weapons*, but because of the threatened or actual breach of the peace accompanying it.

3. An unlawful arrest, made without warrant, is a trespasss; and, like other trespasses, it may not, in the particular case, constitute an aggravated provocation. The fact that an officer or citizen attempting the arrest (and being slain in so doing) has exceeded his authority, does not reduce the killing to manslaughter, if the slayer had no valid reason to belive himself in immediate danger of death or great bodily harm, and the homicide was in fact perpetrated not in passion or sudden heat, upon the provocation of the arrest, but with cool, deliberate malice and premeditation. An attempt to arrest a person in violation of law may afford such provocation to the person arrested as to reduce the killing from murder to manslaughter. If the attempt to arrest be unlawful, the party sought to be arrested may use such reasonable force, proportioned to the injury attempted upon him, as is necessary to effect his escape, but no more; and he cannot do this by using or offering to use a deadly weapon, if he has no reason to apprehend a greater injury than a mere unlawful arrest.

4. In trials for homicide committed in resisting unlawful arrests the accused has the right to have the question passed upon by the jury, under proper instructions of the law of the case from the court, as to whether his action in dealing the fatal blow

was prompted solely by sudden passion, provoked by the unlawfulness of his arrest, or whether it resulted from malice, or a premeditated design to effect the death of the deceased. If it was the result solely of such sudden passion, then his offence is manslaughter, but, if from premeditated design, then it is murder.

Writ of Error to the Circuit Court for Duval County.

The facts in the case are stated in the opinion of the court.

*T. A. and B. B. McDonell,* for Plaintiff in Error.

*The Attorney General* for Defendant in Error.

TAYLOR, C. J.:

Frank Roberson, the plaintiff in error, was indicted for the crime of murder in the first degree in the Circuit Court of Duval county on the 15th day of August, 1899, and on the same day was formally arraigned and pleaded not guilty. He was tried upon such indictment, found guilty of murder in the first degree and sentenced to death. From this judgment he took writ of error from this court, and the judgment was here reversed on April 24th, 1900, and a new trial awarded (See Roberson v. State, 42 Fla. 223, 28 South. Rep. 424). The cause was again tried in June, 1900, and again resulted in a conviction of murder in the first degree for which the defendant was again sentenced to death, and to review such judgment again comes to this court on writ of error.

At the trial now under review the court gave to the jury the following charge, numbered 8: "Sheriffs, deputy sheriffs and constables are authorized to arrest public offenders without warrant for a felony committed in the presence of the officer making the arrest, or if they have reasonable ground, for believing that such felony has been committed; and by our statutes, sheriffs, etc., are invested with authority to apprehend without warrant any person who is in the disturbance of the peace, and to carry him before proper magistrates for further proceedings according to law; and in addition any such officers may arrest without warrant for any misdemeantending to a breach of the peace when committed in the presence of the officer making the arrest. Carrying concealed weapons is such a misdemeanor tending to a breach of the peace, if you find from the evidence be-

yond a reasonable doubt that such offence was committed in the presence of the officer." This charge was duly excepted to and is assigned as error, particularly the latter portion thereof reading as follows: "Carrying concealed weapons is such a misdemeanor tending to a breach of the peace, if you find from the evidence beyond a reasonable doubt that such offence was committed in the presence of the officer." The pith of this instruction is that sheriffs, deputy sheriffs and constables may lawfully arrest without warrant for any misdemeanor that tends to a breach of the peace, when committed in the presence of the officer making the arrest; and that carrying concealed weapons is such a misdemeanor tending to a breach of the peace, as, when committed in the presence of the officer, will authorize an arrest by such officer without warrant.

In view of the evidence disclosed to us in the record, the last above quoted portion of this instruction in reference to the power of officers to arrest without warrant for the misdemeanor of carrying concealed weapons is erroneous. The evidence pertinent to the charge under discussion is in substance as follows: Mary Weston, for the State, swore that she was at Pablo on the afternoon of June 26th of last year; that while on her way to a store she met the defendant and his brother walking arm in arm, and that as they passed her one of them shoved her off the side walk. Upon her remonstrating with them one of them drew a pistol from his pocket and said "I will let daylight through you." The defendant and his brother then went on. She (the witness) then saw Capt. Dennis and told him that two boys had pistols and went with him and Mr. Sadler (the deceased) to point them out. She pointed them out to Mr. Sadler and Dennis Jenkins. The two last named acted as deputy sheriffs.

She saw Dennis and Sadler go up behind the boys. Dennis going on one side of them and Sadler on the other. She saw the defendant pull away from Sadler and shoot him and then ran and fired several other shots. When the defendant fired at Mr. Sadler he fell back. I don't think Mr. Sadler shot. I did not see his gun. Cross-examined: she testified that the boys did not stop after shoving her off the side walk, but went on through the pavillion, that she saw Dennis Jenkins standing by the store and went to him about what the boys had done. He was only a short distance away. Dennis and Mr. Sadler were standing together. Dennis asked Mr. Sadler to go with him. I told him these two boys had pistols and that they drew them on me. He did not know until after the boys had walked on and I told him that the boys had drawn their pistols on me. I am satisfied that neither Jenkins or Mr. Sadler knew that the boys had pistols until after I had complained to them. The boys went on through the pavillion. They had not gotten to the pavillion when Jenkins and Sadler started after them. I followed behind to point them out. The boys went through the pavillion and Dennis and Sadler followed them through into the opening under the shed. I still followed them to point out the boys. Jenkins and Sadler did not know who the boys were until I told them. Mr. Sadler and Jenkins were in the opening when the firing commenced.

Jerry Delaney, for the State, testified as follows, in substance: I reside at Pablo, and saw the shooting of deputy sheriff Sadler by the prisoner Frank Roberson on the 26th of June last. I saw Mr. Sadler and Dennis Jenkins, the deputy sheriffs, coming towards me. Right in front of them walked two colored boys close together, who I know as the defendant Frank Roberson and his

brother Mose Roberson. Sadler and Jenkins walked fast-
er than the two boys and soon came up with them. Com-
ing up with the boys Sadler went on the right and Jen-
kins on the left. Sadler took the prisoner by the right
arm. The prisoner pulled away and drew his gun, jump-
ed back and fired at Sadler twice when he was about
·eight feet from him. The prisoner then ran across the rail-
road track, turned and fired again, then ran and turned
again and fired another shot. The railroad runs east and
west. He and the prisoner were on the south side of the
track when the shooting occurred first, then he ran
across to the north side of the track in a northwest di-
rection. As soon as the prisoner shot Mr. Sadler I and
Lowe called out to Sadler to shoot. We also called out
to Dennis Jenkins to shoot. When the prisoner fired the
first shot he was about two feet from Sadler. After the
second shot was fired by the prisoner Mr. Sadler fell to
the ground. He was shot in the breast. I saw
Sadler's corpse next day and attended his fun-
eral. Sadler drew no pistol until after I called out to
him to shoot. The prisoner shot Sadler almost instan-
eously after Sadler put his hand on him. Sadler fell about
five or six feet trom where he was shot. When Sadler
came up to Frank Roberson he took hold of his arm
firmly. When the shooting occurred I was between fif-
teen and eighteen feet from them. Sadler and Jenkins
had on badge of deputy sheriff. That of Mr. Sadler was
a large metal badge with "Deputy Sheriff Duval Coun-
ty" on it. It was pinned to his coat and could be easily
seen. The shooting occurred in Duval county, Florida.
The defendant was captured that night about twelve
miles from Pablo as he was coming across a trestle at
Pottsburg Creek. Cross-examined: When Sadler and
Jenkins came up with them they separated the two

43 Fla. 12.

Roberson boys, Sadler and Jenkins going on each side of Frank Roberson. Sadler caught him by the arm and Jenkins laid his hand on his other arm. Frank Roberson swung himself loose and shot Sadler about five or six feet from him when he fired the first two shots. Jenkins and Sadler made no demonstration as if to draw pistols until after Frank Roberson had shot and I had called to them to shoot. Sadler fired his pistol as he was falling. Jenkins fired as the prisoner was running just as he got across the railroad track. The prisoner was running as Sadler fired. Sadler did not fire until after the second shot was fired by the prisoner.

Dr. Hoyle Haddock testified that he made a *post mortem* examination on the body of the deceased, Charles M. Sadler; that his death was caused by a thirty-eight calibre revolver bullet.

N. B. Broward testified that he was sheriff of Duval county at the time of the shooting and that Sadler and Dennis Jenkins were both deputies of his at that time.

Isaiah Small, for the State, testified that he was down at Pablo on the excursion on June 26th of last year and saw the shooting of Dennis Jenkins and Mr. Sadler on that day by the two Roberson boys. I was also a deputy sheriff at the time. At the time Mr. Sadler was shot I had been called about arresting a man for carrying concealed weapons, about the same time Mr. Sadler and Dennis Jenkins were called to arrest Frank Roberson, the defendant. I saw Mr. Sadler and Jenkins go up to the prisoner, Mr. Sadler on one side and Dennis Jenkins on the other. Mr. Sadler talked to the prisoner and told him, I have to arrest you for carrying concealed weapons. Mr. Sadler's remark was: "My boy, I have to arrest you for carrying concealed weapons," and he took hold of him. Frank Roberson whirled around as soon as

Mr. Sadler put his hands on him and shot Mr. Sadler. Dennis Jenkins then drew his pistol and fired at Frank Roberson as he was running away. As soon as Dennis Jenkins fired at Frank Roberson, Mose Roberson shot Dennis Jenkins in the back. Mose then ran and went behind a sign board and fired three more times. After Frank Roberson fired the first shot he ran across the railroad and fired three more shots at Mr. Sadler. I saw Mr. Sadler fall as he fired at Frank Roberson as the latter was running away. Cross-examined: I heard Mr. Sadler say to Frank Roberson, "I arrest you for carrying concealed weapons," and he then took hold of him.

Tom Brown, for the State, testified that he was present and saw the shooting of Sadler by the defendant. At the time the shooting took place I was standing only a few feet from them. When Mr. Sadler made the arrest of Frank Roberson, the latter jerked away and fired two shots, then he ran away and turned around and fired two more shots. I went to Mr. Sadler, who was then laying on the ground and assisted to do what I could for him.

The State here rested its case, and the defendant offered no testimony.

From this testimony we gather the following brief summary of the circumstances attending the arrest of the defendant that resulted in this unfortunate homicide: The defendant and his brother, *out of the presence and view of the two officers,* committed a breach of the peace by shoving a woman from the side walk, at the same time intimidating her by a threatening display of a pistol. After this actual breach of the peace comes to an end, the two brothers pass on and the woman seeks the two officers (deputy sheriffs) and informs them of the behavior of the two brothers, and also informs them that said two brothers are carrying pistols concealed on their

persons. Neither of the two officers knew that the two brothers were carrying concealed weapons except from what the woman told them. Upon receiving this information from the woman the two officers at once, without procuring a warrant for their arrest, start out to find the brothers, the woman accompanying them to point them out. Upon discovering the two brothers walking close together, the two officers step up behind them, one officer on the right and the other on the left of the defendant brother, the deceased officer saying, "boys I have to arrest you for carrying concealed weapons," and at the same time taking hold of the arm of the defendant, while the other officer laid his hand on the other arm of the defendant. The defendant instantly swung himself loose from the grasp of the officers, whipped out his pistol and fired two shots in rapid succession at the officer Sadler, then ran away, turning as he ran and firing two or three shots more at Sadler, who had been mortally wounded by one of the two first shots. Under these circumstances was the arrest of the defendant by the two officers, without a warrant, authorized by law? We think that it was not a lawful arrest. The antecedent infraction of the peace by the defendant had ended, and had occurred out of the presence and view of the officers, and at the time of the arrest the defendant was conducting himself in a quiet, peaceable and orderly manner. It is true, as subsequent events quickly proved, that he was at the time secretly armed with a pistol, but he was at the time making no threatening display of it; and it would seem to be uttering a solecism to say that a man behaving himself in a quiet, peaceable and orderly manner, but having a pistol quietly *concealed* on his person, tended towards a disturber of the peace from the bare fact of being *secretly* armed with such pistol. Breaches of the

peace generally manifest themselves by some outward, visible, audible, or violent demonstration, not from quiet, orderly and peaceable acts *secretly* done, though such acts may be *mala prohibita*. The carrying of arms in a quiet, peaceable and orderly manner, but concealed on or about the person, is not either a breach of the peace or *malum in se*; neither does it, of itself, tend to a breach of the peace, but it becomes a misdemeanor only because it is prohibited by statute. The statute does not declare it to be a breach of the peace, nor does the statute authorize an arrest without warrant for its infraction.

Section 4723 of the Code of the State of Georgia (edition of 1882) provides that "an arrest may be made for a crime, by an officer, either under a warrant or without a warrant, if the offence is committed in his presence, or the offender is endeavoring to escape, or for other cause there is likely to be a failure of justice for want of an officer to issue a warrant." The Supreme Court of Georgia, in the case of Pickett v. State, 99 Ga. 12, 25 South. Rast Rep. 608, construing the effect of this statute in authorizing an officer to arrest without warrant for the crime of carrying concealed weapons, says: "While, under section 4723 of the Code, an officer may, without a warrant, make an arrest for an offence committed in his presence, he has no authority, upon bare suspicion or upon mere information derived from others, to arrest a citizen and search his person in order to ascertain whether or not he is carrying a concealed weapon in violation of law. The constitution of this State expressly declares in the bill of rights that 'The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated.'  *   *   *   *   *   If any search is unreasonable and obnoxious to our fundamental law,

it is one of the kind with which we are now dealing. Even if the person arrested did in fact have a pistol concealed about his person, the fact not being discoverable without a search, the offence of thus carrying it was not, in legal contemplation, committed in the presence of the officer, and the latter violated a sacred constitutional right of the citizen in assuming to exercise a pretended authority to search his person in order to expose his suspected criminality." Our citizens are safe-guarded in the same way against unreasonable seizures and searches in their persons, houses, etc., by the twenty- second section; of the Declaration of Rights in our constitution of 1885, and whether we agree or not with the Georgia court that even in the presence of a statute expressly authorizing officers to arrest without warrant for any crime committed in their presence, such officer is not authorized, on bare suspicion, or on mere information derived from others, to arrest without a warrant for the crime of carrying concealed weapons when actually committed in the presence of such officer, yet, in a State like ours, where we have no such statute authorizing officers to arrest without warrant for any and all crimes generally when committed in the presence of such officer, and where the common law prevails, in the absence of statute conflicting with or abrogating it, we think it clear that an officer can not lawfully arrest a person here without a warrant for the bare crime of carrying concealed weapons, whether he knows it of his own knowledge or is informed of it by others and whether it occurs in or out of his presence, unless it is done in such a manner or under such circumstances as, in the presence of the officer, to create, threaten, or amount to a breach of the peace; and even in the latter case the arrest would be

authorized, not from the *bare fact of carrying concealed weapons,* but because of the threatened or actual breach of the peace accompanying it. Quinn v. Heisel, 40 Mich. 576; Hatton v. Treeby, L. R. 2 Q. B. Div. 452; State v. Holcomb, 86 Mo. 371; Commonwealth v. Wright, 158 Mass. 149, 33 N. E. Rep. 82.

In the well-considered case of Briggs v. Commonwealth, 82 Va. 554, the court, discussing the law of homicide of an officer in resisting an unlawful arrest, says: "The deceased was without authority to make the arrest, and the plaintiff in error was not bound to submit to an unauthorized arrest. The law upon this subject is stated by Mr. Bishop as follows: 'If one, even an officer, undertakes to arrest another unlawfully, the latter may resist him. He has no protection from his office, or from the fact that the other is an offender. But the doctrine * * * that nothing short of an endeavor to destroy life will justify the taking of life, prevails in this case; consequently, if the one to be arrested kills the officer or private individual in resisting, he commits thereby the lower degree of felonious homicide called manslaughter.' * * * This doctrine, however, must be qualified by the consideration of the existence of malice, * * * and by the principal which compels every man to avoid, as far as possible, the extreme necessity to take life. If, upon being assaulted, the passion of the assaulted person become greatly excited, and under that impulse he kill his assailant, though it be with a deadly weapon, the offence is manslaughter only. Yet should his resistance with a deadly weapon be made in a very cruel manner, not at all justified by the nature of the assault, the inference would be that malice, not passion, impelled the blow making his crime murder. So, one who, excited in resisting the outrage of an illegal

arrest, kills the aggressor with a deadly weapon, commits only manslaughter, unless acting from express malice. The true view of the law, in reason, is that when the mere fact of an illegal arrest, attempted or consummated, appears, if the one suffering it kills the officer or other arresting person, whether with a deadly weapon or by other means, he may rely on the presumption that his mind was beclouded by passion; but if actual malice is affirmatively proved, the homicide will be murder." The same case asserts that the question arises in such cases whether the killing is by reason of the sudden passion, caused by the illegality of the arrest, or by reason of malice. If the first, then it is manslaughter only; if the second, then it is murder. The same case also sanctions the inference of the existence of malice in such cases from the facts and circumstances in proof tending to show its existence. Such as whether the arrest was made in an exasperating or violent manner; and whether the defendant, *at the time of the shooting*, was loose and free from the officer, or actually in his clutches; and whether the defendant fled immediately, and continued to shoot after fleeing. And we might add that in the proofs in the present case there are other facts proper to be considered upon the question of the existence of malice on the part of the defendant at the time he did this shooting, such, for instance, as his unprovoked prior assault upon the woman, and wanton threat to shoot her, as tending to evince a depraved mind, regardless of human life; the fact that he did not stop to enquire or ascertain whether the deceased had a warrant for his arrest or not, and consequently that he did not know when he shot whether his arrest was lawful or unlawful. All of these are proper circumstances to be considered by the jury upon the question of the existence of malice or premed-

itated design. To the same effect is the case of Brooks v.
Commonwealth, 61 Pa. St. 352, S. C. 100 Am. Dec. 645.
In Galvin v. State, 6 Coldwell 283, the Supreme Court
of Tennessee says: "An unlawful arrest made, *bona fide*,
under color of legal authority, is but a trespass, and like
other trespasses, it may not in the particular case, con-
stitute an aggravated provocation. The fact that an of-
ficer or citizen attempting the arrest (and being slain in
so doing) has exceeded his authority, does not necessar-
ily reduce the killing to manslaughter, if the slayer had
no valid reason to believe himself in immediate danger
of death or great bodily harm, and the homicide was, in
fact perpetrated, not in passion or sudden heat, upon the
provocation of the arrest, but with cool, deliberate mal-
ice and premeditation. An attempt to arrest a person in
violation of law, may afford such provocation to the per-
son arrested as to reduce the killing from murder to man-
slaughter. The killing is still unlawful and a felony. If the
attempt to arrest be unlawful, the party sought to be
arrested may use such reasonable force, proportioned to
the injury attempted upon him, as is necessary to effect
his escape, but no more; and he can not do this by using,
or offering to use, a deadly weapon, if he has no reason
to apprehend a greater injury than a mere unlawful ar-
rest." To the same effect is the case of Jones v. State, 26
Tex. App. 1, 9 S. W. Rep. 53, S. C. 8 Am. St. Rep. 454.
In the case of Miller v. State, 31 Tex. Crim. Rep. 609,
21 S. W. Rep. 925, S. C. 37 Am. St. Rep. 836, it is said:
"A person is not required to submit to illegal arrest, but
may demand the warrant or proper authority, and in its
absence repel force by force, provided, the force does
not exceed prevention and defence. The right to repel
force by force continues until the person attempting the
illegal arrest presses forward with such violence that the

person defending is obliged to choose between three things—to retreat, to surrender, or the death of his adversary. If the force used is disproportionate to the injury about to be inflicted, self-defence is eliminated, and if it is attributable to any other cause than resistance to the illegal arrest, such arrest can not be a mitigating circumstance. An illegal arrest is deemed in law a great provocation, and, if conceded, to constitute adequate cause, yet to reduce a killing in resisting such arrest to manslaughter, sudden passion must have existed in the mind of the slayer at the time of the homicide, otherwise the killing is murder. In such case adequate cause, and sudden passion must concur. The existence of an unknown provocation to the accused, as that the warrant for his arrest is illegal, at the time he kills an officer while resisting arrest, is not sufficient to reduce the homicide below murder." Reg. v. Chapman, 12 Cox C. C. 4.

In view of the law as above stated, touching the rights of the citizens in cases of unlawful arrests, and the fact that the arrest in this case has been found under the facts in proof to have been unlawful, the defendant had the right to have the question passed upon by the jury, under proper instructions of the law of the case from the court, as to whether his action in shooting the deceased was prompted solely by a transport of sudden passion provoked by the unlawfulness of his arrest, or whether it resulted from malice or a premeditated design to effect the death of the deceased. If it was the result solely of such sudden passion, then his offence was manslaughter; but if from premeditated design, then it was murder. The latter part of the questioned charge of the court erroneously converted the facts of the arrest, as an assertion of law, into a lawful arrest, when it was otherwise, thus eliminating from the con-

sideration of the jury the questions involving the defendant's right in a case of *unlawful* arrest. Such charge was, therefore, vitally erroneous, and necessitates a reversal of the judgment of conviction.

.Various other errors are assigned upon refusals to give divers instructions requested on behalf of the defendant; of these several are abandoned here by non-argument; of those argued it becomes necessary for us, after what has already been said, merely to add that we have examined such refused instructions and find that they were properly refused.

The assignment of error predicated on the court's denial of the defendant's motion in arrest of judgment has been abandoned here.

For the error found, the judgment of the court below is reversed and a new trial ordered.