STATE v. LOWMAN *ET AL.*

(133 S. E., 457)

1. HOMICIDE—IN ORDER THAT CONVICTION OF THREE DEFENDANTS FOR MURDER OF SHERIFF SHOT DURING RAID BE SUSTAINED, THERE MUST HAVE BEEN CONSPIRACY ON PART OF DEFENDANTS.—In order that conviction of three defendants for murder of Sheriff who was shot during raid on defendants' home can be sustained, there must have been conspiracy on part of defendants to attack officers.

2. HOMICIDE.—Occupants of house had right to use necessary force in keeping officers, who held search warrant, from entering house and in expelling them until authority of officers was made known.

3. HOMICIDE—CHARGE THAT, AS SHERIFF HAD SEARCH WARRANT, EVERY PERSON IN HOUSE SHOULD SUBMIT HELD ERRONEOUS AS EXCLUDING DEFENDANTS' RIGHTS TO PROTECT THEMSELVES UNTIL THEY KNEW PARTIES MAKING SEARCH WERE OFFICERS.—In prosecution for murder of Sheriff, charge that Sheriff had search warrant to search house, and that every person in house should submit, *held* erroneous as excluding right of defendants to protect themselves until they knew that parties making search were officers.

. Before RICE, J., Aiken, May, 1925.   New trial granted.

Demon Lowman, alias Son Lowman, and others were convicted of murder and they appeal.

*Mr. N. J. Frederick,* for appellant, cites: *Fair trial guaranteed:* 91 S. C., 36. *Court should have ordered continuance of his own motion:* 16 C. J., 450. *Defendant physically unable to prepare for trial:* 6 Ind., 407. *Duty of Court to declare whole law of case:* Const. of 1895, Art. V., Sec. 26; 56 S. C., 213; 26 S. C., 599. *Duty of officer making arrest to make himself known and exhibit warrant:* 95 S. E., 138; 72 S. C., 107; 5 C. J., 393 and 419. *Whether arrest properly attempted question for jury:* Wharton on Homicide, 3rd Ed., Sec. 404; 5 C. J., 421. *Officer making arrest in threatening manner may be resisted:* 261 Tex. App., 1; Wharton on Homicide, 3rd Ed., Sec. 400; 11 A. & E. Enc. of Law, 2nd Ed., 980. *Attack on house may be resisted:* 89 S. C., 501; 1 Wharton on Crim. Law, 11th Ed., 808. *Communication made to attorney in public not*

*privileged:* 40 Cyc., 2375. *Absence of motive for crime where evidence purely circumstantial:* 11 Wharton on Crim. Ev., 10th Ed., 1827. *Circumstantial evidence must be inconsistent with innocence:* 16 C. J., 765. *Official character of deceased unknown to defendant may reduce murder to manslaughter:* Wharton on Homicide, 3rd Ed., Sec. 403 and 624; 29 C. J., 1098; Wharton on Crim. Law, 741.

*Messrs. B. D. Carter, Solicitor, R. L. Gunter* and *J. B. Salley,* for respondent.

May 27, 1926.

The opinion of the Court was delivered by MR. ACTING ASSOCIATE JUSTICE R. O. PURDY.

The following statement is taken from the case on appeal:

"On the 25th day of April, 1925, Sheriff H. H. Howard was killed while he and his three deputies were attempting to search the house and premises of Sam Lowman for contraband whiskey; the said officers being at that time armed with a search warrant duly issued. The appellants were also wounded at the time. Bertha was taken to Leesville Hospital, and Clarence and Demon, alias Son Lowman, and two other defendants, Rosa and Birdie Lowman, were taken to the State penitentiary, all of whom were thereafter lodged in Aiken County jail on May 8th.

"Upon indictment charging the appellants and the said Birdie and Rosa Lowman with the murder of the said H. H. Howard, they were duly arraigned on May 9th, May, 1925, in the Court of General Sessions for Aiken County. In answer to the Court's inquiry, they all stated that they had no counsel. Whereupon the Court, at the time of arraignment, appointed counsel for them; members of the Aiken bar being appointed for each of the defendants to represent them in the trial of the case. On the fourth day after arraignment, the case was called for trial. No motion was made for a continuance; counsel for each defendant announcing in open Court that they were ready for trial.

Whereupon the trial proceeded before his Honor, Judge H. F. Rice and jury, resulting in a verdict of not guilty as to Birdie and Rosa Lowman, but guilty as to the appellants, with recommendation to mercy for Bertha Lowman. Judge Rice sentenced the appellants Demon alias Son Lowman, and Clarence Lowman to be electrocuted on June 12th, and sentenced Bertha Lowman to life imprisonment. No motion for new trial was made, but from this sentence and judgment the said Demon, alias Son, Clarence, and Bertha Lowman now appeal; notice of appeal having been served within due time.

"While all the appellants were wounded at the time Sheriff Howard was killed, Bertha's condition appearing serious for a few days, at the time of the trial, and at the trial neither of them exhibited evidence of weakness or unfitness for trial. Bertha's arm was still carried in a sling, but otherwise she appeared strong. The other two appellants showed no signs of ever having been wounded and neither of the appellants made any complaint, either themselves or by their counsel, that they were unable to stand trial. There was nothing immediately preceding or in the course of the trial to evidence any hostile or unusual feeling against the appellants."

On account of the nature and rapidity of the concurrences at the time that Sheriff Howard came to his death, it is extremely difficult to make a satisfactory statement of the events that transpired, and, besides, an extended statement is not necessary. The sheriff, with three deputies, McElheney, Robinson and Sheppard, approached the house of Sam Lowman, having a warrant to search the house for contraband liquor, and the warrant was in the possession of Robinson. They did not know where Lowman lived. and so, seeing three boys in a field about 50 yards away from the house, they stopped and asked them if Sam Lowman lived there. These were negroes, and one of them, Demon Lowman, alias Son Lowman, was about 21 years old; Clarence Lowman, then 14 years old, and a small boy named

Roy. (In addition to these three, who were members of the household of Sam Lowman, his family consisted of the woman, Annie, who was afterwards killed, the mother of Demon and Bertha, Rosa, the wife of Demon, who was about his age, Bertha, the sister of Demon, and a young girl named Birdie.)

The officers approached the house, and stopped in front of it; the sheriff and Robinson going to the right of the house, Sheppard going to the left, and McElheney going to the front door. There were some women at the back of the house. Upon seeing the officers, they ran to the house, and were intercepted at the back door by the sheriff, who told them to stand back, "and Bertha grabbed the sheriff." Annie, the mother of Demon and Bertha, attempted to assault Robinson with an axe, and, Sheppard interfering, she threatened to assault him with the axe, and he shot and killed her.

It appears that Demon Lowman entered from the front of the house, and got a pistol and fired on McElheney, and afterwards exchanged shots with Robinson in the yard. Someone shot the sheriff, and killed him at the rear of the house, and during the melee Bertha and Demon were wounded, and Clarence was afterwards also shot. One of the witnesses said that all of the events in the house occurred in a few seconds.

It is manifest, from the nature of the case, that, if the judgments against the defendants are to stand, there must have been a conspiracy on the part of the defendants to attack the officers. It is not the province of this Court to discuss the testimony, but from the nature of the testimony it will not be amiss to say that a conspiracy could not have been formed by all of the defendants to attack the officers after the officers arrived upon the premises, and the testimony given by the witnesses does not disclose that a conspiracy existed before the visit of the officers. The concluding part of the preliminary statement in the case is:

"There was nothing immediately preceding, or in the

course of the trial, to evidence any hostile or unusual feeling against the appellants."

This statement is not convincing to the Court that a deep feeling against the defendants did not exist. In the first place, it would have been contrary to human nature for the people of the county not to have felt deeply incensed over the slaying of a useful officer and a highly honored citizen, and, in the next place, the able and conscientious trial Judge deemed it expedient to state in his charge the reason for the appearance of the counsel appointed by the Court for the defendants. The reason for this is manifest. The Judge knew, or feared, that without such statement the resentment which existed in the minds of the community might react against the attorneys. Without such idea in his mind, there would have been no reason for making such statement in his charge.

His Honor charged the jury, in part, as follows:

"Mr. Foreman and Gentlemen of the Jury: This case is drawing to a close. These defendants, Demon Lowman, Clarence Lowman and Bertha Lowman are the defendants that you are to try. As to Rosa and Birdie Lowman, you will return a verdict of 'not guilty.' Before I go into the law of the case, I want to say this, so that there may be no misunderstanding as to the attorneys representing these defendants. Some person might be so foolish as to condemn these attorneys for undertaking the defense of these defendants. But I want to say that they were appointed by the Court—none of them wanted to do it—but it was their duty, when the Court appointed them to come up and do their duty, because it makes no difference what crime any one has committed, the law says that they shall have a fair and impartial trial, and, if the crime with which they are charged is a capital offense, then it is the duty of the Court to appoint some attorney to see that the evidence is presented to the jury, and these attorneys, while it was very disagreeable on their part, came here, and, under appointment of the Court, undertook to bring out the facts in the case as best they

could, so that the Court assumes all responsibility for that, and I hope that no one will be so foolish as to ever condemn them for doing that which they are bound to do under their oath as attorneys. All that they were required to do was to see that their clients got a fair and impartial trial, and that the evidence was brought out so that the defendants would get a fair trial by getting all of the facts in the case. * * * I want to say that justice does not always reach the white man when he is charged with murder, but I have never yet seen a case tried where I thought a negro tried by a white jury was done an injustice, and I feel that you are going to give these defendants a fair trial.

"Now, Gentlemen of the Jury, it is no need for me to pass any further on Sheriff Howard, whom the defendants are charged with killing. I have said while he was living, and I say now that he is dead, that I thought he was the best sheriff in South Carolina. There is not any doubt in my mind about that. He was a man who was fearless in the discharge of his duty, and at the same time was not too harsh in discharging those duties. He was a man above reproach, and I think that is enough to say of any man. These defendants are charged with murdering him, and, no matter how much all of us may have thought of Sheriff Howard, we are bound by our oath to see that these three defendants get a' fair and impartial trial at our hands."

His Honor charged the law of self-defense and of conspiracy, telling the jury that, if the defendants were acting independently, only the one offending could be convicted, but that, if they all knew that the men were officers, and had come to search the premises for whiskey, and with such knowledge, started to fighting them, then all would be principals, and, if one killed the sheriff, all would be guilty. He charged also that, ordinarily, "a son seeing a father or mother engaged in a fight would not stop to argue who was right or who was wrong, but, if they go into a fight and kill a person, their right would be the exact rights of the parent. If the parent was in the right, and it was necessary

for the parent to do as the child did, then the child would be entitled to do the same." And he charged further:

"Now, the State must satisfy you, as they charge, that the defendants acted in concert; and the State must satisfy you beyond a reasonable doubt that one of the defendants did this killing, and there was a plan or concert among them to oppose the officers; and I will say now there is no dispute that the sheriff had a search warrant to search the house for contraband whiskey and that he had with him his deputies, and, having a search warrant, it was his duty, under the law, to go and search that house, and it was the business of every single person in that house to submit to it, and not to oppose him in his search."

His Honor further charged the jury that they were bound by their oath to see that the defendant got a fair and impartial trial. This involved a fair and impartial trial under the law pertaining to the situation in which they were placed. As was well said by Mr. Justice Marion in *Bushardt v. United Inv. Co.,* 121 S. C., 335; 113 S. E., 641; 35 A. L. R., 637:

"The law is not a respecter of persons, and in its administration should not be open to the criticism that members of a race who have no part in its official enforcement are denied the consideration and protection to which they are justly entitled."

The defendants were at their home where they had a right to be, and, when the officers approached, were not engaged in the commission of any unlawful act. It does not appear that any of the defendants knew that the sheriff and his deputies were officers; certainly not before the disturbance commenced, and the testimony on that point throughout the case is of a doubtful character as to imparting this knowledge to the defendants.

The defendants had a right to use so much force as was necessary in keeping the officers from entering the house, or in expelling them from it and protecting themselves in their home, until the authority of the officers

was made known, and then it was their duty to submit, or resist at their peril.

In *Farmer v. Sellers,* an action by a widow against another for killing her husband while undertaking to execute a warrant, the Court said: "Farmer was killed while forcing his way into defendant's house. On that point there was no dispute. The practical question before the jury then was, not whether defendant took the proper means to get Farmer out, but whether he was justified in shooting him while he was forcing his way in, in order to prevent the entry or to prevent defendant's own death or serious bodily injury. On this issue the instruction was clearly given that, if Farmer was entering without authority of law the defendant had a right to oppose him by force, to ·the extent of taking his life, if necessary." *Farmer v. Sellers,* 89 S. C., 492; 72 S. E., 224.

As already stated, his Honor charged the jury:

"And I will say now there is no dispute that the sheriff had a search warrant to search the house for contraband whiskey, and that he had with him his deputies, and, having a search warrant, it was his duty under the law to go and search that house, and it was the business of every single person in that house to submit to it, and not to oppose him in his search."

The necessary consequence would follow that, if there was any resistance, the persons resisting would be guilty, leaving only the measure of guilt to be fixed by the jury.

The charge excluded the right of the defendants to protect themselves against search, if they did not know that the parties making the search were officers, and carried with it, as a matter of fact, the idea that, having a search warrant, the sheriff and his deputies could make the search, and that the occupants of the premises would resist at their peril. The defendants were entitled to have the jury charged that they could stand on their rights as the occupants of the premises and protect their home from invasion, using so much force as was necessary, unless they

knew that these persons were officers with the right to search, and by this charge they were deprived of that right. *Hodge v. Railroad Co.,* 109 S. C., 62; 95 S. E., 138. *State v. Byrd,* 72 S. C., 107; 51 S. E., 542; Wharton Hom. (3d Ed.) §§ 404, 400; Wharton, Cr. L. (11th Ed.), 808; 5 C. J., 419, 421; 11 A. & E. Enc. L., 980. *Jones v. State,* 26 Tex. App., 1; 9 S. W., 53; 8 Am. St. Rep., 454.

Taking the setting of the whole case, and the conditions which surrounded the defendants at the trial, and the errors pointed out in his Honor's charge, which affected all of the defendants, a new trial is granted as to all of them.

Mention has not been made of an exception to the exclusion of the testimony of Mr. Stansfield, one of the counsel. There was no error in not permitting him to testify.

A new trial is granted.

MESSRS. JUSTICES WATTS and COTHRAN and MR. ACTING ASSOCIATE JUSTICE J. H. MARION concur.

MR. CHIEF JUSTICE GARY did not participate.