# DECISIONS

OF THE

# Supreme Court of Florida

## JANUARY TERM, 1912.

BASCOM CARLTON, DAN CARLTON AND MARION CARLTON, *Plaintiffs in Error*, v. THE STATE OF FLORIDA, *Defendant in Error*.

1. Threats made against the deceased by two of the three persons indicted for his murder on the night before the homicide, not made in the presence of the third party, are admissible in evidence against the two who made them, as tending to show their animus against the deceased, and the third person indicted is not injured by such evidence when the court instructs the jury that such threats are not evidence against such third party.

2. No error is committed in refusing to permit a party charged with an unlawful homicide to prove that he voluntarily surrendered to the officer, when the State had not undertaken to show that he evaded arrest.

3. The question whether the title to an act was broad enough to cover some of its Sections is of no moment, when the sections of said act were subsequently embodied in the General Statutes of 1906.

4. Section 3262, General Statutes of 1906, is not unconstitutional because it excepts sheriffs and other police officers from its operation, as said exception or classification is based on a public necessity, and is not in conflict with any specific provision of the constitution.

5.  The statutes against carrying concealed weapons have no connection with Sec. 20, of the Bill of Rights, which preserves "to the people the *right to bear arms* in defense of themselves and the lawful authority of the State."

6.  Since the adoption of Sections 3262 and 3263 of the General Statutes of 1906, the carrying of concealed weapons is a breach of the peace which authorizes an arrest by an officer without warrant; and Sec. 3929 is broader and gives an officer authority to arrest without warrant any one who in the presence of such officer violates any of the penal laws of this State, or of any municipality, and makes it the duty of such officer to arrest without warrant and take into custody any person whom such officer has reasonable ground to believe, and does believe, has committed any felony, or whom he finds in the act of committing any felony, or about to commit a felony, or engage in a fight, or other breach of the peace.

7.  Where a person fires a pistol in a village behind a cold drink stand within one hundred yards of an officer's residence, it may fairly be said that the pistol was fired in the presence of the officer and is an offense under Sec. 3626 General Statutes of 1906, for which an officer may arrest the person firing the pistol without warrant.

8.  Requested instructions not warranted by the evidence are properly refused.

Writ of Error to the Circuit Court for St. John's County.

The facts in the case are stated in the opinion of the court.

*Jno. E.* and *Julian Hartridge,* and *A. R. Logan,* for Plaintiffs in Error;

*Park Trammell,* Attorney General, and *C. O. Andrews,* for the State.

HOCKER, J.—Bascom Carlton, Dan Carlton and Marion Carlton were indicted on the 25th. of April, 1911, in the

Circuit Court of St. Johns County for the murder of one Guy White on the 5th. day of March of the same year. On the trial Bascom Carlton was convicted of murder in the first degree with recommendation to mercy, and Marion and Dan Carlton were convicted of murder in the second degree, and each of them sentenced to the State Prison for life. The judgments are here for review on writ of error. Before discussing the assignments of error, the writer will endeavor to give a synopsis of the evidence.

On Saturday, the 4th of March, 1911, Bascom and Dan Carlton went from the neighborhood of Espanola to Hastings, in St. Johns County. They went on the East Coast Railroad. Their brother Marion went with them as far as Dinner Island and there Marion left the train. At Hastings Dan and Bascom figured around the bar-rooms considerably, bought and drank whiskey, and one of them, probably Bascom, got into some trouble in a place where there was dancing, by stepping on someone's toe. Some disturbance occurred which led to the arrest of Bascom and Dan. They gave bond, were released and spent the night at a private house. They say that they were arrested just about midnight when they were ready to take a train back to Espanola. They got on the train Sunday morning to go back to Espanola. At Dinner Island they were joined by Marion Carlton. A youth named Burney who worked with Bascom near Española also went to Hastings, and was on the train on Sunday morning. He was drunk and had a pistol which Bascom says was his, he having left it in his room where Burney got it. It was evident all these parties were drinking. The pistol which Burney had was taken from him by one of the parties and given to Marion or Dan, but finally

found its way to Marion. The defendants say that when Marion got off the train on Saturday at Dinner Island Bascom gave him his pistol, which Marion returned to him on Sunday when he got on the train. It was proven that Bascom and Dan on Saturday night at Hastings made threats of killing Guy White and another man Kelley, who had arrested them at Hastings. The defendants got off the train Sunday at Espanola about 12:30 o'clock. The evidence tends to prove that they hung around the depot for some time in the negro waiting-room. There is some evidence that the agent requested Guy White, who was a deputy sheriff, to get them away from the depot. Marion and Dan went first from the depot to a vacant cool-drink stand about 100 yards from the depot. They say they went there to have a settlement of money matters as Marion was to leave the next day. Some time after Marion and Dan went to the cool-drink stand Bascom joined them. The evidence tends to prove that while they were at this place Marion and Bascom indulged in threats about Guy White and another person; that they seemed to anticipate trouble with Guy White, the deputy sheriff, and expected to kill him. Then a pistol shot was fired by Marion, and Guy White, the deputy sheriff, hastened to the spot, calling upon one Snyder, who seems also to have been a deputy sheriff, and one Durrance to go with him. When Guy White reached the parties he demanded who shot off the pistol. Marion answered that he did it, and he says he told White the pistol was accidentally fired. White demanded the pistol, and in trying to get it a short struggle ensued; but he finally got it, and then notified the three brothers they were all under arrest. It appears that Marion was boisterous and used threatening language, but that Dan counselled moderation and urged there be no trouble.

Dan told White he had no pistol. No effort was there made to secure Bascom's pistol. There was evidence from which the jury might have inferred that the pistol was fired off to attract the attention of White, and bring him to the place with the view of precipitating a difficulty with him, and of carrying out the threats that had been made. After the brothers were put under arrest by White with the aid of a posse which he had called together, he undertook to take them to a jail or calaboose which was some fifty yards away. Espanola was a small settlement, the houses being some distance apart. On the way to the jail Marion was obstreperous, and threatened to kill the whole of the arresters when he was turned loose. Handcuffs were put on him by Snyder, which White took off as soon as he reached the jail. The jail was a small wooden building with a passage way down one side, and three cells down the other, with doors opening on the passage way. The deputy sheriff White, Snyder and some of the posse escorted the arrested parties into the passage way, Bascom being the last of the brothers to enter. They arranged themselves along the passage way in front of the cell doors. Snyder had his pistol drawn. The evidence on the part of the State tends to prove that when the parties were all in the passage way as above indicated, one of the posse named Dorman being next to Bascom, that White then said to Bascom he would have to search him to see if he had a gun or knife; that White then attempted to put his hands in Bascom's pocket and that as he did so Bascom drew his pistol and fired rapidly twice, killing both White and Snyder. Dorman seized the pistol in the hands of Bascom, and a struggle took place. The State's witnesses say that both Dan and Marion seized Dorman, one choking him and the other holding his arm, but others pre-

sent came to Dorman's help with the result that he held on to the pistol. There was then a separation of the parties, the defendants leaving the scene as well as the members of the posse. The State's witness Durrance says that when he went up to the cold-drink stand to aid White, Marion was very ugly to him, saying to him and Snyder who was with him, "You two sons-of-bitches, I am talking to Guy, if you got any word against me say it you bastards." He also says that when Marion got about half way to the jail he said to the men who were guarding him, "You three sons-of-bitches, I will kill you if I ever get out of this.. I know you." Durrance says he also heard Dan or Marion, he could not tell which, say just as the shots were fired "Kill all inside and outside." He also says he heard no cursing of Guy White, though Bascom and Marion protested against being arrested by him. Mr. Sabate, a deputy sheriff, who arrested Dan and Marion after the shooting on the night of March 5th, testified that they said to him "that when Bascom killed Mr. White, shot Mr. White, just previous to the shooting, when they were put in jail, that they knew he was going to shoot, they stepped inside into one of the cells and he did the shooting;" and again that they said "they stepped into the cell one side to keep out of the way as it was of the shooting." Mr. Dean testified for the State that on the night of the killing he saw Dan at the witness' camp about a mile from Espanola. Dan came to his gate and called him. The witness told him to come in and sit down, which he did. A fellow named Burney was with him. Dan said "Well I guess you heard what happened." Witness said "I heard, I hope it is not so." Dan said "well the Jew Snyder is killed;" that Bascom kill him. He also said "One thing I am sorry of, there was another damned long cracker in there, I am sorry they didn't kill

him." Dan also said "He knowed the thing was going to happen, and stepped back one side out of the way. He said Bascom told him that if he ever got that much drop on Guy White he would kill him. He also said Dan was cutting ties for the witness. The Carltons deny making the threats which the State alleged were made before the killing, and they deny saying the accusing things which the State's witnesses say were made after the killing by Marion and Dan. They all say that when Bascom shot, White or some one had cried out "Shoot the sons-of-bitches," or words of like import, and Bascom claims that he shot because he thought he was about to be shot himself. These statements are in conflict with the testimony of the State's witnesses. The foregoing is a synopsis of the evidence.

It is difficult to discover from the brief of plaintiffs in error what particular assignments of error are most relied on. The first part of the brief seems to be devoted to a general discussion of assignments "under the tenth to the twentieth inclusive." These assignments deal with charges given, and instructions refused. Next assignments, 5th, 6th, 7th, and 8th are grouped and discussed together in the brief, as is also done in the case of the 19th, and 20th, assignments; and lastly the 21st, 22nd, 23rd, 24th, 25th, 27th, 28th, and 29th are grouped, and the court is asked to apply the arguments made under the other assignments to these. Under these circumstances we shall first discuss those assignments that are specifically argued.

Several assignments question the propriety of permitting in evidence threats alleged to have been made at Hastings on the night of March 4th, by Bascom and Dan Carlton. We think this evidence was proper as to these

two as showing the animus of the parties. The court instructed the jury that declarations and admissions of the declarations were not evidence against such as were not present.

Under the 9th assignment it is contended that the court erred in not permitting Bascom Carlton to prove that he surrendered voluntarily to the officers. The State had not undertaken to show that he had fled and no authority is shown to support this contention, and we know of none.

Assignment ten questions a charge of the court based on Section 3263 General Statutes of 1906, making it a breach of the peace to carry concealed weapons, and authorizing an officer to arrest for said offense without a warrant.

It is first contended that the original act of 1901, of which this section is a part, is unconstitutional because its title was not broad enough. This is now of no moment as the act is brought forward and reenacted in several sections of the General Statutes of 1906.

It is next contended that section 3262 is unconstitutional because it excepts sheriffs and other police officers from its operation and permits them to carry concealed weapons, which is denied to others. We are not referred to any special provision of our State Constitution which this statute is supposed to violate, and none occurs to us at this time. Apparently the exception or classification is based upon a public necessity growing out of the difficulties and hazards which sheriffs and other officers encounter in dealing with dangerous characters. These statutes against carrying *concealed weapons* have no connection with Section 20 of the Bill of Rights which preserves to the *people* the right "to *bear arms* in defense

of themselves and the lawful authority of the State." This section was intended to give the people the means of protecting themselves against oppression and public outrage, and was not designed as a shield for the individual man who is prone to load his stomach with liquor and his pockets with revolvers or dynamite, and make of himself a dangerous nuisance to society. See the case of State v. Workman, 35 W. Va. 367, 14 S. E. Rep. 9, as reported in 14 L. R. A. 600, and important note; Presser v State of Illinois 116 U. S. 252, 6 Sup. Ct. Rep. 580.

The eleventh assignment of error attacks a portion of the charge of the court defining a conspiracy. The contention is, there was no evidence of a common design to murder Guy White. We think there were facts before the jury which saves the charge from the general attack upon it, which was made. Their sufficiency was left by the court to the jury.

The twelfth assignment is based on the refusal of the Circuit Judge to give an instruction to the effect that an officer was not justified in making an arrest without a warrant when the person whom he arrests is not at the time in the presence of the arresting officer commiting a breach of the peace, or criminal offense, or engaged in open violence by fighting or engaging in a fight, or about to escape after committing a felony.

It is alleged in the brief that this instruction is based on the case of Roberson v. State, 43 Fla. 156, 29 South. Rep. 535. Since this decision was made the statute law has been changed by sections 3262 and 3263, General Statutes of 1906. The latter makes the carrying of a concealed weapon a breach of the peace, and authorizes any officer to arrest for the offense without warrant. Section 3929 is broader, and gives an officer authority to

arrest without warrant, anyone who in the presence of such officer violates any of the penal laws of the State, or of any municipality, and makes it the duty of such officer to arrest without warrant and take into custody any person whom such officer has reasonable ground to believe, and does believe, has committed any felony, or whom he finds in the act of committing any felony, or about to commit any felony, or engage in a fight, or other breach of the peace. This section became law since the decision in Roberson v. State *supra.*

Section 3626 is as follows: "Whoever discharges on any public highway or in any unincorporated village within three hundred yards of any premises, any fire arms, without permision from the occupant of said premises, or in defense of life, limb or property, shall be punished" etc.

It may be fairly said that Marion Carlton fired his pistol in the presence of Guy White, the deputy sheriff. The firing was done within 100 yards of White's residence, in the village of Espanola, and the only thing that prevented White from actually seeing the act of shooting was that Marion was behind the little shed called a cold-drink stand. Evidently White heard the shot and immediately repaired to the spot where it occurred.

At common law sheriffs and other police officers, *virtute officii,* and all who aid them are empowered by law to arrest not only felons and those suspected of felony, but also persons guilty of a breach of the peace, or just suspicion thereof such as night walkers and persons unduly armed. 2 Hale's P. C. 85, 86. Hale gives weighty reason why peace officers should have these powers.

In Ramsey v. State 92 Ga. 53, 17 S. E. Rep. 613, it is held that an officer may arrest without warrant for wife-beating if he arrives at the scene during the pro-

gress of or immediately after the beating, he being attracted thereto by the noise of the disturbance, or the outcry of the woman. This was based on a section of the Georgia Code authorizing an officer to arrest without warrant if the offense is committed in his presence.

In the case of State v. McAfee, 107 N. C. 812, 12 S. E. Rep. 435, it is held that "Where the defendant struck his wife a blow with a stick in a public road so near to the officer (a justice of the peace) that he could hear the sound made by the blow, and the cries of the woman, though on account of the darkness he could not actually see the assault, it was such a breach of the peace in the presence of the officer as authorized him to arrest the assailant without a warrant." To the like effect is the decision in the case of Dilger v. Commonwealth, 88 Ky. 550, 11 S. W. Rep. 651; Hawkins v. Lutton, 95 Wis. 492, 70 N. W. Rep. 483, 60 Am. St. Rep. 131, and note discussing what constitutes a breach of the peace.

Under the facts of the instant case we think it clear that Guy White was authorized to arrest the defendants Bascom and Marion Carlton and Dan also if the facts were such as authorized him to believe there was a conspiracy to produce a breach of the peace in which they were all engaged.

The thirteenth assignment of error is based on the refusal of the court to give an instruction to the effect that an officer in making an arrest is not authorized to use more force than is necessary. We do not think the evidence warranted this instruction. There is no evidence that Guy White used more force in arresting the defendants than was necessary. What we have already said disposes of a number of the assignments of error.

The fifteenth assignment is based on the refusal of the court to instruct the jury that under the law of Florida a homicide is justifiable when committed in the lawful defense of a brother. The difficulty with this instruction is that it assumes that Bascom Carlton shot White while White and Snyder were attempting to arrest Dan and Marion Carlton, and they were resisting an unlawful arrest. The evidence does not warrant such a hypothesis. The assignments based on the hypothesis that Guy White committed an unlawful arrest of the defendants we do not think it necessary to consider. The facts seems to us to show a lawful arrest.

Several of the asignments of error question the correctness of the verdict as to each and all of the defendant. All of the Justices are of opinion that the evidence is sufficient to sustain the verdict as to Bascom Carlton. Chief Justice Whitfield, Justice Shackleford and Justice Cockrell are of opinion that there is sufficient evidence that Dan and Marion Carlton were present aiding and abetting in the murder of Guy White. On the sufficiency of the evidence to sustain .the conviction as to Dan and Marion Carlton, Justice Taylor dissents, and the writer dissents as to Dan Carlton.

The judgment below is affirmed as to all the defendants.