**CHARLES B. SAVAGE v. STATE OF FLORIDA**

11 So. (2nd) 778                          January Term, 1943
February 5, 1943                                   Division A

368

*Fred W. Pine, Henry R. Carr* and *William W. Judge,* for appellant.

*J. Tom Watson,* Attorney General, *Woodrow M. Melvin* and *J. R. Bullock,* Assistant Attorneys General, for appellee.

CHAPMAN, J.:

The appellant, Charles B. Savage, on November 21, 1941, was indicted by a Dade County grand jury for the crime of murder in the first degree. The indictment alleged that Charles B. Savage, on April 1, 1941, unlawfully and from a premeditated design to effect the death of Hannah Ford, alias Hannah Savage, did kill and murder her by submerging her beneath the water, thereby drowning, strangling and suffocating her. He entered a plea of not guilty to the indictment, was placed upon trial, and by a jury convicted of manslaughter. He challenged the sufficiency of the evidence adduced by the State of Florida to sustain the verdict by a motion for a directed verdict made at the conclusion of the evidence offered by the State and again on motion for a new trial. These motions were denied by the trial court and the appellant sentenced to the State prison at hard labor for a period of twelve years. From said verdict, judgment and sentence an appeal has been perfected here.

Counsel for the respective parties, during their argument at the bar of this Court, presented and discussed several questions for adjudication as reflected by the record. It appears that an answer by this Court to the question, viz: Is the testimony adduced by the prosecution legally sufficient to sustain the verdict, judgment and sentence of manslaughter as entered in the lower court? will not only dispose of the several questions posed, but will dispose of the case on its merits.

Section 782.07, Fla. Stats. 1941, defines manslaughter thusly:

"Manslaughter,—The killing of a human being by the act, procurement or culpable neligence of another, in cases where such killing shall not be justifiable or excusable homicide nor murder, according to the provisions of this chapter, shall be deemed manslaughter, and shall be punished by imprisonment in the state prison not exceeding twenty years, or imprisonment in the county jail not exceeding one year, or by fine not exceeding five thousand dollars."

Russ v. State, 140 Fla. 217, 191 So. 296, was a manslaughter case and the information alleged that Gussie M. Wells was mortally wounded in a collision with an automobile negligently operated by Amon H. Russ on State Highway No. 1, near the City of Marianna, in Jackson County, Florida, around 7:00 o'clock P. M., April 11, 1938. The deceased was 58 years of age and weighed about 150 pounds when injured. She was in good health and free from impaired vision and hearing normal. She crossed the highway from her home to obtain some articles at a store in preparation of the evening meal. The blood on the highway where the car struck the deceased disclosed that she walked into the car and was injured. Russ did all within his power to prevent the collision, even driving the right wheels of the car, off the pavement. We held that the evidence was legally insufficient to sustain the conviction. We said:

"This Court is committed to the rule that the degree of negligence required to sustain imprisonment should be at least as high as that required for the imposition of punitive damages in a civil action. The burden of proof authorizing a recovery of exemplary or punitive damages by a plaintiff for negligence must show a gross and flagrant character, evincing reckless disregard of human life or of the safety of persons exposed to its dangerous effects; or that entire want of care which would raise the presumption of indifference to consequences; or such wantonness or recklessness or grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others, *which is equivalent to an intentional violation of them.* See

Cannon v. State, 91 Fla. 214, 107 So. 360; Shaw v. State, 88 Fla. 320, 102 So. 550; Kent v. State, 53 Fla. 51, 43 So. 773; Florida East Coast R. Co. v. Hayes, 65 Fla. 1, 60 So. 792.

"This Court adopted the rule viz: that the character of negligence authorizing punitive damage is the same as the character of negligence required to be shown by the State in order to sustain a conviction under Section 7141 C.G.L., as to criminal liability. See Cannon v. State, *supra;* Austin v. State, 101 Fla. 990, 132 So. 491."

See Graives v. State, 127 Fla. 182, 172 So. 716; Hawkins v. State, 120 Fla. 905, 163 So. 133.

It is a legal presumption that a person charged with crime is innocent and this presumption accompanies the accused throughout each step of the trial. The burden of proof under the law is cast on the State to adduce evidence to establish each material allegation of the indictment showing the guilt of the accused beyond a reasonable doubt. See Frank v. State, 121 Fla. 53, 163 So. 223; Rivers v. State, 140 Fla. 487, 192 So. 190; Goddard v. State, 143 Fla. 28, 196 So. 596; Grady v. State, 129 Fla. 416, 176 So. 431; Sanchez v. State, 133 Fla. 160, 182 So. 640.

The evidence discloses that Charles B. Savage, age 45, and Hannah Ford, a widow, approximately 65 years of age, intermarried at Fort Lauderdale, Florida, March 1, 1941. Charles B. Savage on April 1, 1941, jointly with his brother, owned a dredge located on or near a canal running along a public highway connecting Ojus on the mainland with Sunny Isles on the Atlantic Ocean in Dade County, Florida. The appellant and Hannah Ford, shortly after the noon hour, on April 1, 1941, were riding east in a convertible Packard car on the road from Sunny Isles to Ojus, when the car left the highway and plunged into a nearby canal. The car was completely submerged except a few inches of the top, Savage extricated himself and a passerby assisted him in slicing the top of the car and removing the body of Hannah Ford from the submerged car onto the highway. Efforts to resuscitate her failed. The cause of her death was attributable either to shock or drowning, or both, according to the testimony of an examining physician. The car was in good mechanical

condition when taken from the canal, with the brakes in good condition and the tires retained sufficient air pressure.

The canal was about 25 feet in width at the point where the car left the highway and the car, when in the canal was about 9 feet from the bank nearest the highway. The highway was about 24 feet wide and straight for a considerable distance each way from the point where the car left the highway. From the edge of the pavement to the water's edge is about 4½ feet, and the bank pitched downward from the pavement to the edge of the water in the canal. It was a clear and bright day. A dredge was seen, or could have been seen, near the point where the car left the highway and plunged into the canal.

The appellant told Mrs. Hyler on the day that Mrs. Ford was buried: " 'It was terrible what happened.' He said he 'drove off the road accidentally.' He didn't tell me how it happened." Charles Mulcahey examined the point where the car left the highway, but failed to find "skid marks." Harry Garbler asked the defendant at the time they were trying to resuscitate Mrs. Ford. "How it happened." The defendant said: "When I woke up I was in the water; that is all I know about it." The witness Garbler also testified:

"Q. I say, he didn't explain any more than that? A. He didn't explain any more; that is the only thing he answered me. Then I was just excited. Q. So far as you could see, did he render every assistance possible to help to save the woman? A. Well, he held her head. Q. I say, so far as you could determine, did he render every assistance possible? A. Well this fellow you see that was giving her the artificial respiration didn't want nobody to interfere with him; he was busy right along, and he wouldn't move or say anything; just "Get me a blanket; help me to put that under.' Didn't let nobody do anything to the body. He just worked like a clock on her, and this man Mr. Savage held her head. He was there because they wanted her to lay on her side, and the water came out. First when they brought her out there was a foam come out of her mouth. Q. You saw him first on top of the car helping to get the body out of the car—that is Mr. Savage? A. Three fellows; yes. Q.

But Mr. Savage was among them? A. That's right, him and another two men. Q. And when they got the body ashore, Mr. Savage held her head; how long did he hold her head? A. Well, he held her head for quite awhile, and the doctor arrived; and then the doctor talked to him something on the quiet, but I couldn't hear what he said. Q. Was that the only thing that you heard Mr. Savage say while you were there—what he said to you? A. That's all I heard. Q. And he was wet himself? A. Well not on his shoulders, but his body was wet to a certain extent; I noticed water dripping a little bit. Q. He wasn't wet all over? A. I couldn't say; I wouldn't say whether he was or he wasn't."

Constable Chastain testified viz:

"Q. You talked to Mr. Savage; and did he tell you how the accident happened? A. He did. Q. What did he say? A. There was a dredge almost opposite the scene of the accident: Q. Yes. A. I asked him if he could give any reason why that he lost control of the car or that the car went in the water. He said that he could just—the only thing he could think of that he possibly might have been looking at the dredge and had taken his eye off the road, misjudging the distance that he must have lost his bearing and run into the water . . .

"Another question: 'Q. What did he tell you?' Your answer: 'A. He said he was driving in a westerly direction on this particular road; and he pointed out a dredge which was almost opposite the scene of the accident; and he said that he must have taken his eyes off the road, looking over to the dredge, which was his property. That is the only explanation he made. He said that when he was looking over to the dredge he took his eye off the road and must have lost control of the car to such an extent that it went into the canal.' Is that correct? A. That is correct."

Mr. Mills testified that he visited the scene and talked with defendant Savage, and the colloquy occurred viz:

"A. I talked to Mr. Savage as to his car going in the canal up on Sunday Isles Road; I asked him how fast he was driving, he said about 50 miles an hour. I also talked to him about turning around at the bridge and going back west

on Sunny Isles Road; and he said that he crossed the bridge and went over on the Sunny Isles side to see some one, went up to a door and knocked and there wasn't anybody at home, and left and came back down Sunny Isles Road. I asked him how come him to run in the canal; he said that he must have looked over at a dredge on the south side of the road. I asked him several other questions, and then Mr. Savage said that he would rather not answer any other questions until he had his attorney. Q. Did you go out to the location where this car went in the canal? A. Yes, sir; I did. Q. Did you see a dredge in that vicinity? A. Yes, sir; there is an old dredge on the south side of the road, quite a distance back in from the road. Q. Is it plainly visible from the road? A. No, sir, not until you get right up to the opening. There is an opening in the brush and growth there; there is only one spot along there that it is visible from the road, and that is along almost the same place where the car went in the canal."

. . .

"Q. I will ask you if this is the statement that you made at the inquest: 'By I. R. Mills, Esq., Investigator for the State Attorney's office: I just want to state that I arrested Mr. Savage and took him to the office on the 19th floor of the court house; called the assistant County Solicitor, Al Hubbard; and in the back office we asked Charlie Savage if he cared to make a statement as to the death of Mrs. Ford. He said he did not; he said he would like to have his attorney with him. We told him he could have his attorney. Then we asked him how fast he was driving when he went into the canal and he said, not more than 40 or 50 miles an hour.' A. That is true. Q. You didn't use '40,' just now. A. I said, about 50 miles an hour. Q. Here it is 40. A. That is true; 40 or 50. Q. And that is correct, he didn't just confine it to 50? A. That is correct, the testimony there. Q. He said, not more than 40 or 50? A. That's right."

Evidence in the record shows that the deceased was ill or complaining on the same day a short time prior to getting in the Packard car with Savage. She owned real estate located in Dade County and considerable testimony was offered by the State showing conveyances of real estate to Savage

and to third parties, who in turn conveyed the property to Savage. The testimony was admitted on the theory that it established a motive on the part of Savage to dispose of his (alleged) wife and thereby acquire her property. It is shown that several parcels of this property had been conveyed by the deceased prior to the car catapulting into the canal. The motive for the crime is not an important factor under a manslaughter charge. The verdict of the jury acquitted the defendant of all crimes alleged in the indictment above manslaughter. The defendant below did not take the witness stand or offer any evidence in his behalf and the case was submitted to the jury only on the testimony adduced by the State.

The State did not offer eye witnesses to the tragedy. Among the first witnesses on the scene was Mr. Fleury. He supplied a knife and he and the appellant cut open the top of the car and removed the deceased. Every possible effort was made to resuscitate her. The appellant, during this time, held his hand under the head of the deceased on the hard pavement. He frankly told inquiring witnesses how the accident occurred; that he was driving the car at a rate of speed of about 40 or 50 miles per hour and took his eyes off the road on which he was driving to look at his dredge and lost control of the car and went into the canal. The circumstances surrounding the events, beginning with the time that the appellant was driving and took his eyes off the road to look at his dredge, coupled with his admission at the time, and appellant's subsequent action and conduct, as shown by the record, must be closely scrutinized to determine if the law was violated or a crime committed, as shown by the testimony offered by the State.

The burden of proof by law is cast upon the State of Florida to establish the guilt of the defendant beyond a reasonable doubt. The law permits the State to prove the guilt of the accused by circumstantial evidence. Where the evidence relied upon for conviction is entirely circumstantial, the law requires that such evidence, as a whole, must be so strong, cogent, and convincing as to exclude every reasonable hypothesis except that of the defendant's guilt. See Solomon

v. State, 115 Fla. 310, 156 So. 401; Brown v. State, 127 Fla. 225, 172 So. 921; Free v. State, 142 Fla. 233, 194 So. 639.

The decisions of this Court hold that in order to sustain a conviction in a criminal case for the negligent operation of an automobile on a highway, the evidence adduced to support the charge should be at least as high as that required for the imposition of punitive damages in a civil suit. The burden of proof authorizing a recovery for the plaintiff for negligence must show it to be of a gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects; or an entire want of care which would raise the presumption of indifference to consequences; or such wantonness or recklessness or grossly careless disregard of the safety and welfare of the public or the reckless indifference to the rights of others which is equivalent to an intentional violation of them.

Counsel for the State of Florida, during oral argument and in their brief, contend that the conviction appealed from should be sustained because the appellant was, under the law, charged with the utmost care and caution in the operation of the automobile at the time and place it was driven by the appellant and left the highway and came to rest in the canal, because: (a) he was transporting a weak, sick and aged passenger; (b) he was operating a dangerous thoroughfare by the side of which was located a canal filled with water.

The answer to these respective contentions is: (a) that a person *vel non* transporting a weak, sick and aged person, *ipso facto,* is not guilty of manslaughter; (b) he was operating a dangerous instrumentality over and upon the highway. This may be true but it does not constitute the crime of manslaughter of which appellant stands convicted on this record; (c) the appellant was traveling a dangerous thoroughfare by the side of which was located a canal filled with water. It is shown that he was traveling at the speed of 40 to 50 miles per hour and appellant took his eyes from the road he was traveling and glanced at a dredge near by and the accident occurred. Can these facts bring the appellant within the enunciated rule so as to constitute the crime of

manslaughter. While the operation of the atuomobile at the time and place and under the circumstances enumerated may be reckless indifference to the rights of others or such wantonness or recklessness or gross careless disregard of the safety and welfare of the public, it has not by the testimony appearing in this record made so to appear. We cannot assume, in the absence of testimony, as a matter of law, on this record that the appellant is guilty of the crime of manslaughter.

The judgment is reversed and a new trial awarded.

BUFORD, C. J., TERRELL, and ADAMS, JJ., concur.