HOLT, Associate Justice.
Like most tragedies this one had its beginnings innocently enough. Some timé after good dark on March 8, 1952, Thomas C. Huntley and Samuel Huntley, his brother, who will be referred to" as appellants unless the situation indicates otherwise, were passengers in an automobile driven by James Wilson, accompanied by two others whose names are not material, all of whom were Negroes. James Wilson attempted to turn on Peter Brown Lane on their way to The Gay Jook Joint further on down the lane, and while attempting to negotiate the turn his car slid into the ditch on the north side of the lane as the car was headed in an easterly direction. James Wilson and appellant Thomas C. Huntley proceeded on up the lane to the jook where they prevailed upon one John Henry Graham (Negro) to get his truck and pull their car from the ditch, which he proceeded to do. Thereafter, the decedent, Mr. Jim Chancey (white) driving an old army surplus weapons carrier without a cab or body, turned into Peter Brown Lane, stopped at a position where the rear of his truck was approximately opposite the rear of the truck of John Henry Graham, who had left it there after pulling the car of James Wilson from the ditoh. This truck (after having pulled the Wilson car from the ditch, to the west side headed east, same being on the north side of the lane) was left on the right side, the north side of" the lane, headed west. The decedent Chancey inquired why the road was blockaded which his great uncle had put there. John Henry Graham started over toward Chancey’s truck and Chancey told him to stand back. Appellant Samuel Huntley started toward Chancey who reached' down and got his gun, a single barrel shotgun, and told him to stand back. At this juncture a Mr. Fred Brumley, a white man driving a similar truck to that of the decedent Chancey, appeared on the scene and parked immediately behind the Chancey truck headed east. All lights on all vehicles at the scene were burning at all times. Brumley got out of his truck and asked decedent Cliancey, “What’s going on here,” and the decedent Chancey replied that he was “going to kill four or five of these damn niggers.” At the time he voiced these words decedent Chancey was standing in the road on the left hand side of his truck by the steering wheel. During the conversation between decedent Chancey and Brumley, appellant Samuel Huntley appeared, who came back to the scene in an automobile driven by unidentified persons from a place where he had gone to seek help to get the Wilson car out of the ditch, which automobile approached from the east, from which Samuel Huntley disembarked and then, the car turned around and returned in the direction from which it had arrived. Samuel Huntley walked onto the scene from the east on decedent Chancey’s right. He walked down the, middle of the road and when he reached a spot about opposite the rear wheels of the truck of James Henry Graham, which would place him some 8 to 12 feet from decedent Chancey, the decedent Chancey made a motion with his gun and ordered Samuel Huntley to stand back, which he did. Shortly after this occurred, another automobile driven by a Negro, Wise Blake, arrived on the scene loaded with three other Negroes who later became state’s witnesses. Their names were O. B. Blake, Connell Huggins and Arthur L. Huggins. They parked their car on the right side of the road immediately behind the truck of Fred Brumley. At this juncture when the Wise Blake automobile *506 stopped the decedent Chancey left his stand at the left front wheel of the truck, turned his back on the appellants, walked down the road to the left front of the Wise Blake automobile that had just arrived. He told the Negroes in that car, “Boys get out and stand here, I’ll let you by in a few minutes.” Two of the passengers got out and two remained in the car. Then decedent Chancey returned to his stand at the left front of his truck at a point approximately mid-way between the door and the wheel on the left side. During all of this time there was a great deal of cursing by the decedent Chan-cey, although some of the state’s witnesses deny this. Then decedent Chancey turned back to his truck and his back to appellants at which time appellant Samuel Huntley grabbed him and took his gun from him, and as one of the witnesses testified when Samuel Huntley took the gun, said to decedent Chancey, “I’ll shoot hell out of you.” After appellant Samuel Huntley had taken decedent Chancey’s gun appellant Thomas C. Huntley grabbed a standard off the truck of John Henry Graham and struck decedent Chancey over the head with it. As described in the record, a standard was a heavy wooden post approximately four feet long and varying from three to five inches in diameter. There is some conflict in the testimony as to how many blows were struck and where. A careful reading of the record leads us to the conclusion that the decedent was struck at least twice and maybe three times, as Dr. J. B. Brinson, to whom the decedent was brought before dying, testified. The first blow was struck as decedent was going to the left side of his truck or to the driver’s seat and was such a severe one that it knocked him to his knees. Then decedent Chancey got up, went in front of his truck and on around to the right hand side and fell into the truck, half of his body being in and his legs and feet dangling out, at which time appellant Thomas C. Huntley struck him again on the head with the standard. The appellants in their testimony claimed that they heard someone in the crowd holler, “Look out, he has got another gun,” or “he is going to get another gun.” But the physical facts after the conflict fail to disclose any such weapons being present in the truck or anywhere else. As decedent lay half in the truck, appellant Samuel Huntley took the gun, reached over from the driver’s side thereof and hit decedent as he lay in the truck and as a result decedent fell on the ground in a dying condition as later proved, where he remained until removed to the doctor’s office. Immediately after hitting decedent with the gun, appellant Samuel Huntley then punched the lights out on decedent Chancey’s truck with the ■butt of the shotgun. The other parties at the scene, including the white man Brum-ley, left as precipitately as possible, and appellants proceeded on to the jook joint and left the decedent Chancey to die, which he did, the next day about 6 o’clock P. M-
The sheriff of Jefferson County, where this tragedy occurred, testified after appellants were arrested, that appellant Thomas C. Huntley admitted striking decedent with the. standard, that appellant Samuel Huntley told him he had struck decedent with the gun. This sums up the facts of this most unfortunate occurrence.
The appeal here is from a conviction of appellants of murder in the second degree for which the trial judge sentenced them each to a lifetime of servitude in the state penitentiary. It is contended by appellants and set forth in two questions, (1) that appellants are entitled to a new trial because as a matter of law the facts resulting in their conviction do not evidence a killing perpetrated by an act imminently dangerous to another, and evincing a depraved mind regardless of human life as second degree murder is defined; (2) that the facts reflect the killing to be justifiable homicide.
This compels us to evaluate the evidence which was presented to the trial court, and after a careful reading of it we conclude that the verdict was amply supported thereby.
Here we find a white man participating in a controversy with these Negroes. That he was in the wrong is beyond doubt and he continued to be so until he broke off the *507 controversy, after he had been rendered harmless by appellant Samuel Huntley snatching his gun from him. He was practically in full and rapid retreat attempting to get back to his truck, and a comparative position of safety, when appellant Thomas C. Huntley grabbed the standard from the truck and hit the decedent while he was leaving and practically running from the scene. Not only did appellant Thomas C. Huntley hit decedent in that situation, but after decedent had painfully gained the front part of his truck and fell over therein, appellant Thomas C. Huntley continued the attack and hit the decedent over the head with the standard while decedent was helpless and prostrate, and as the examining physician testified, it was “a terrible lick.” Not being content with this, appellant Samuel Huntley, who had taken decedent Chancey’s gun, went to the other side of the truck and with the butt of the gun hit decedent in the head knocking him down and out of the truck to the ground where he lay dying from approximately 8 o’clock at night until 11 p. m. of the same night when he was taken to the doctor, who described decedent as being “in a dying condition.”
Moreover, the knocking out of the lights óf the decedent Chancey’s truck is another truthful indication of the state of mind of both appellants. Although there is some conflict in the evidence, it is reasonable to say, that after the gun had been taken from the decedent, there could be no further ground of fear of apprehension of bodily injury on the part of appellants. Therefore, these facts could not support a verdict of justifiable homicide because danger to themselves had long since passed and the dominance and control of the situation had changed to their hands when the killing occurred. See Lovett v. State, 30 Fla. 142, 11 So. 550, 17 L.R.A. 705; Lightbourn v. State, 129 Fla. 43, 175 So. 857; Rowe v. State, 120 Fla. 649, 163 So. 22. This is proven -by the testimony of the state’s witnesses, some of whom even testified that decedent never did use curse words and only aimed the gun at appellants one time, the rest of the time it being held by his side pointed toward the ground.
Whatever view is taken of the testimony in the record, there is no question that it reflects on the part of the appellants a situation “evincing a depraved mind regardless of human life.” These words were never meant to be used in a strict technical sense and is well stated by this Court in Ramsey v. State, 114 Fla. 766, 154 So. 855, 856: “It is obvious, therefore, that the phrase ‘evincing a depraved mind regardless of human life,’ as used in the statute [F.S.A. § 782.04] denouncing murder in the second degree, was not used in the legal or technical sense of the word ‘malice’ as above defined. The phrase conveys the idea of ‘malice’ in the popular or commonly understood sense of ill will, hatred, spite, an evil intent. It is the malice of the evil motive which the statute makes an ingredient of the crime of murder in the second degree. See Davis v. Hearst, 160 Cal. 143, 116 P. 530.”
The decedent, a white man, it is true precipitated the conflict. He was in error and had no right nor authority to act as he did and his whole attitude can not be deplored too much. Racial clashes of this kind should be a thing of the past. Every man, regardless of color or creed, is entitled under our Constitution and laws to equal treatment. That this has not been accomplished is not the fault of the law, but of the individual who refuses to recognize such. ' The decedent was “dead” wrong, and he practically invited his own destruction. But on the other hand, we must accept the facts as we find them, as the jury heard them, and as the trial judge evaluated them. The decedent was not wrong enough all the way through the controversy to have to pay with his life for what he did. He was rendered powerless to carry out his threats and intent of “killing four or five niggers,” by the swift protective action of appellant Samuel Huntley, and there it should have stopped. Here the decedent realized (and there was no evidence of alcoholic drinking at all by anyone engaged in this fracas) he was unarmed and rendered helpless, with only one white man with him (Fred Brumley, who as the record discloses, fled as fast as any of the Negroes and was certainly of no aid to *508 decedent), surrounded by Seven Negroes, all of whom he had provoked, interfered with their freedom of movement, held up unlawfully from proceeding to their respective destinations, threatened and cursed at, decedent was determined to leave the scene in his truck as soon as he could get to the seat and start its engine. It is here then that the scales became overbalanced in favor of appellants and against decedent, and without justification in concert- they proceeded to and did kill decedent Jim Chancey.
Under the instructions of the court as given, and the facts as outlined, the jury could have brought in a verdict of murder in the first degree. In these words the jury could have found such a verdict which the trial court properly instructed the jury: “ * * * the law does not prescribe the exact period of time which must elapse between the formation of and the execution of the intent to take life in order to render the design a premeditated one. It may exist for only a few moments and yet be premeditated, if the design was formed a sufficient length of time before its execution to admit of some reflection on the part of the party entertaining it, and the party at the time of the execution of the intent was fully conscious of a settled and fixed purpose to kill and of the consequences of carrying such purpose into execution; where such state of mind exists, the intent or design is premeditated within the meaning of the law although the execution followed closely upon the formation of the intent.”
The taking of the standard from the truck by appellant Thomas C. Huntley (and some witnesses say that he held it behind his back for some time before using it); the assaulting - of decedent and striking him with it not once, but twice and maybe three times; the pursuing decedent around the front of his truck to deal the death blow; all of that coupled with the action of appellant Samuel Huntley, who already having possession of decedent Chancey’s gun which he had taken from decedent (and there the entire matter should have ended), the pursuit of decedent to the left side of his truck after decedent had fallen into it and after his -brother, Thomas C. Huntley, had hit decedent a second or third time with the standard, after which the said appellant Samuel Huntley struck decedent over the head with the butt of the gun, with sufficient force to knock decedent from out of his truck on to the ground, and both appellants’ callous conduct in leaving decedent to die without aid of any kind, all of these facts with their cumulative force and effect compel us to the conclusion that there was within that period, however short it may have been, and regardless of the rapidity of the events then taking place, sufficient time to form the intent and premeditation necessary for murder in the first degree, as to both appellants.
This savage physical personal encounter solved nothing; took the life of a young white man; and practically did the same for his two youthful assailants.
As it is with individuals so it is with nations at war. Nations will never live in peace, nor will the world enjoy such blessedness until we as individuals learn to live in peace with all our neighbors.
O ! Lord when will we ever learn ?
Affirmed.
ROBERTS, C. J., and TERRELL and MATHEWS, JJ., concur.