220 So.2d 53 (1969)
James E. WEAVER, Appellant,
v.
STATE of Florida, Appellee.
No. 68-236.
District Court of Appeal of Florida. Second District.
February 26, 1969.
Rehearing Denied March 25, 1969.
*55 Robert E. Jagger, Public Defender, and Joseph F. McDermott, Asst. Public Defender, Clearwater, for appellant.
Earl Faircloth, Atty. Gen., Tallahassee, and William D. Roth, Asst. Atty. Gen., Lakeland, for appellee.
McNULTY, Judge.
James E. Weaver appeals his conviction of the premeditated murder of a police officer. The jury recommended mercy.
Appellant does not deny that he shot the officer; but the thrust of his defense is that he was justified in killing the officer for the reason that the officer was threatening to make an unlawful entry to search appellant's dwelling. In the alternative, appellant contends that even if the killing was unlawful it can be of a no higher degree of unlawful homicide than manslaughter.
The essential facts in this case are largely undisputed and are as follows:
At approximately 8:08 P.M. on the tragic night, Officer Charles Lee Eustis of the St. Petersburg Police Department responded to a radio dispatch to investigate a disturbance at the appellant's home. When he arrived, whatever the disturbance, if any there was, it had terminated; and there was nothing apparent which would give probable cause to believe a felony had theretofore been committed. The appellant did not testify; and that which occurred after the arrival of Officer Eustis, and prior to the shooting, was described by the only eye witness to that part of the incident, one Frank Biezell, who lived in the apartment above the appellant and who was called by the defense. The material portion of his testimony follows:
"Q. Did  would you tell what you did upon hearing the police officer knock on the door?
* * * * * *
A. I went downstairs.
* * * * * *
Q. All right, what did the police officer do then?
* * * * * *
A. Well, Weaver came to the door and the police asked him what was going on, and so Weaver say him and his wife were having a little discussion.
Q. Yes.
A. Well, then the police officer asked him could he come in.
* * * * * *
Q. What  and what happened then?
A. So then  so he asked Weaver could he come in, so Weaver told him no, that he couldn't come in his house, so the police officer say, `well, I want to see how your wife's doing.' So Weaver said, `I said you couldn't come into my house. I know my rights.' So then that's when the police officer made a step towards Weaver.
* * * * * *
Q. All right, then what occurred?
* * * * * *
A. Weaver pushed him back.
Q. Pushed him back where?
A. Towards the bannister.
Q. All right, did the officer go over the bannister?
A. No, sir.
Q. Then what happened?
A. Well, then he went on the side and pulled this Mace.
Q. The officer did?
A. Yes, sir.
* * * * * *
Q. All right, then what happened?
A. Well, then when he pulled his Mace, Weaver asked him were he `going to spray me?' So then the officer say yes, so he sprayed it.

*56 Q. In the face?
A. I don't know did he spray it in his face or not.
Q. Did you get any of it?
A. Yes, sir.
* * * * * *
Q. What did it do to you?
A. It burned, made my eyes run to water.
Q. And then what did you do or then what happened?
A. Then I ran back upstairs.
* * * * * *
Q. Then what happened between he and Weaver?
A. Well, like I say, he squirted it, and like I say, some of it got on the face, and I went to turn around, and that's when they was up towards the bannister.
Q. What were they doing up towards the bannister?
A. Sort of like a wrassling.
Q. Tussling with each other?
A. Yes, sir.
Q. Then did you see anything further?
A. No, sir.
Q. You went  what did you do, went back upstairs?
A. Yes, sir."
From this point on the record reveals no way by which we can determine precisely what occurred until the joint arrival of Officers Lee and Harrell, who arrived in the area in response to the same radio dispatch to which Officer Eustis had responded. Nor can we reasonably compute the critical intervals of time, except that Officer Harrell testified the radio dispatch was airborne at approximately 8:08 P.M., and Officer Lee testified he checked his watch upon arrival in the area and saw that it was 8:13 P.M. Approximately, then, everything which occurred there that evening between appellant and Officer Eustis, until the death of Officer Eustis, transpired in something less than five minutes.
When Officers Lee and Harrell arrived, they both heard a woman scream; Lee heard a man's voice, which he identified as that of the deceased officer, exclaim: "No ! No !"; and each then heard a sporadic series of shots. As the two officers approached the immediate scene they saw the appellant standing in front of an automobile pointing a revolver toward the ground, and both officers testified they saw the flash of the last shot as appellant held the gun pointed toward the ground under the car. Officer Lee said he then heard the gun clicking several times on empty cylinders. He further testified that as he approached the appellant the latter threw the gun to the ground and said, "Yes, G____ D____ it, I killed him.", at which point Officer Lee then noticed Officer Eustis' body lying under the aforementioned car. The revolver involved was later positively identified as belonging to the deceased officer, and it was established that the fatal bullets were fired from that gun. Three bullet wounds were found in the body; two, significantly, having entered in the back. It was also established by an expert that there were nitrate deposits on the deceased officer's right hand which could have been caused by a discharging firearm.
The corpus delecti was, in other respects, firmly established, and at the conclusion of all the evidence the trial judge denied appellant's motion for directed verdict of acquittal on all degrees of unlawful homicide above manslaughter, and also denied appellant's requested instructions pertaining to the law of defense of habitat. Altogether, appellant raises four points on appeal, only two of which merit discourse.

*57 I.
We consider first whether the court erred in denying appellant's requested instructions pertaining to the law of defense of habitat as it may apply in a homicide case. The basis for such an instruction is found in § 782.02(2)(a), F.S.A., which section defines justifiable homicide and provides as follows:
"(2) Homicide is justifiable when committed by any person in either of the following cases:
(a) When resisting any attempt to murder such person, or to commit any felony upon him, or upon or in any dwelling house in which such person shall be; * * *" (Italics supplied)
The requested instructions in the instant case are substantially those prescribed in Russell v. State.[1] That case did not involve the killing of a police officer who apparently was exceeding his authority, however; and the evidence therein clearly presented a question of fact for the jury as to whether the defendant Trixie Russell was reasonably apprehensive that a felony was being threatened either upon her or in her dwelling. If the jury could find that her fears were reasonable, either as to the imminence of a felony to her person or to her dwelling, the homicide would be justifiable. Therefore, in that case, failure to give such a charge was reversible error.
In this case, there is not one scintilla of evidence which would justify a finding that appellant was reasonably apprehensive that Officer Eustis was about to commit a felony on or about him or his dwelling. The officer only wanted to go into the dwelling to see how the appellant's wife was. The threatened action of the police officer, even if it were unlawful and over the objection of the appellant, was merely a trespass and not felonious. In such case, the simple trespass does not constitute an aggravated provocation which would render justifiable the killing of the officer in resistance thereto.[2] Nor do we think the use of chemical Mace as testified to herein, changes the law on the point, the gravamen of which is that a threatened misdemeanor will not, of itself, justify killing the offender. It is almost a precept, which gathers force by repetition, that men do not hold their lives at the peril of unreasonable fears or disproportionate resistance to real or imagined threats. At most, the threatened use of Mace as testified to in this case, even if carried out, could amount to no more than assault and battery, another misdemeanor. For these reasons, and for those apparent hereinafter, the appellant was not entitled to the requested charges and they were properly refused.

II.
We come now to the question of whether the trial court erred in denying appellant's motion for judgment of acquittal on all degrees of unlawful homicide above manslaughter.
The one case found in Florida, in which a purported police officer was killed in the perpetration of illegal entry and search, is not helpful here since it turned on other points.[3] But there are several cases dealing with an officer being killed from resistance to an illegal arrest;[4] and we perceive no substantive difference between resistance to a mere unlawful arrest and resistance to a mere illegal entry for search when no greater threat of harm exists *58 in either case than the resultant trespass of the person or premises.[5]
The law in Florida on the subject is most clearly summarized in Roberson v. State, supra. In reliance upon, and quoting from, Briggs v. Commonwealth,[6] the Florida Supreme Court in Roberson set forth the principles as follows:
"The deceased was without authority to make the arrest, and the plaintiff in error was not bound to submit to an unauthorized arrest. The law upon this subject is stated by Mr. Bishop as follows: `If one, even an officer, undertakes to arrest another unlawfully, the latter may resist him. He has no protection from his office, or from the fact that the other is an offender. But the doctrine * * * that nothing short of an endeavor to destroy life will justify the taking of life prevails in this case. Consequently, if the one to be arrested kills the officer or private individual in resisting, he commits thereby the lower degree of felonious homicide called manslaughter.' * * * This doctrine, however, must be qualified by the consideration of the existence of malice, * * * and by the principle which compels every man to avoid, as far as possible, the extreme necessity to take life. If, upon being assaulted, the passion of the assaulted person become greatly excited, and under that impulse he kill his assailant, though it be with a deadly weapon, the offense is manslaughter only. Yet, should his resistance with a deadly weapon be made in a very cruel manner, not at all justified by the nature of the assault, the inference would be that malice, not passion impelled the blow making his crime murder. So one who, excited in resisting the outrage of an illegal arrest, kills the aggressor with a deadly weapon, commits only manslaughter, unless acting from express malice. The true view of the law in reason is that, when the mere fact of an illegal arrest, attempted or consummated, appears, if the one suffering it kills the officer or other arresting person, whether with a deadly weapon or by other means, he may rely on the presumption that his mind was beclouded by passion; but, if actual malice is affirmatively proved, the homicide will be murder.' The same case asserts that the question arises in such cases whether the killing is by reason of the sudden passion, caused by the illegality of the arrest, or by reason of malice. If the first, then it is manslaughter only; if the second, then it is murder. The same case also sanctions the inference of the existence of malice in such cases from the facts and circumstances in proof tending to show its existence,  such as whether the arrest was made in an exasperating or violent manner; and whether the defendant, at the time of the shooting, was loose and free from the officer, or actually in his clutches; and whether the defendant fled immediately, and continued to shoot after fleeing."
It is the law, then, that the use of excessive force to repel the unlawful actions of a police officer, which results in the death of the officer, when no greater threat than a mere trespass or other misdemeanor is reasonably apparent, constitutes manslaughter. There is a presumption that such killing was motivated by the anger and passion provoked by the officer's unlawful intrusion. If, however, that presumption is patently negated, and the killing results from premeditation, or is committed in a very cruel manner not at all reasonably justified by the nature of the threatened injury, and thus malicious, the killing would be murder. Applying these principles to this case, we conclude that the evidence, considered in the light most favorable to the appellant, supports a finding that the appellant was guilty of at least manslaughter.

*59 III.
In considering, next, whether the evidence will support a finding of a higher degree of unlawful homicide than manslaughter, we discuss first the principles governing premeditated first degree murder. Under proper instructions from the court on all degrees of unlawful homicide, the jury returned a verdict of premeditated first degree murder. It must thus be assumed that they entertained no reasonable doubt as to each of the essential elements of premeditated murder. But if the evidence is insufficient, as a matter of law, to support a finding as to any essential element of premeditated murder, such a verdict cannot be sustained; and assuming a homicide, if unlawful, it is of a lesser degree.[7]
We are of the opinion that the evidence in this case is insufficient to support a finding of the element of premeditation. Premeditation has been defined as a fully formed conscious purpose to kill existing in the mind of the perpetrator for a sufficient length of time to permit of reflection, and in pursuance of which the act of killing ensues.[8] While it is true that no particular length of time is necessary in order to make the specific intent premeditated, nevertheless some time must have passed, however brief, during which the specific intent is reflected upon or entertained.[9] It necessarily follows that there must be some point from which reasonable minds can compute such a period of time. It is rudimentary, of course, that intent may be inferred from circumstantial evidence. But the point of time at which the specific intent to kill is inferentially formed cannot be left to guesswork and speculation.
Here there is a fatal gap in the evidence on the question of just when the intent to kill was formed, assuming it was formed in the first instance; and therefore, it is impossible to determine the duration of its existence. We have already observed that from the point of time when the witness Biezell last observed the difficulty between appellant and the deceased officer (which at that time was a mere shoving match) until Officers Lee and Harrell arrived, there is no way of knowing what ensued in the course of the struggle; nor is there, indeed, any evidence of just how long the struggle lasted until the fatal shots were fired. We don't even know which of the combatants fired the first shot, since there is uncertainty as to how many shots were fired after the officer was heard to plead, "No ! No !". At that point, we can assume the appellant had the gun, but since only four shots were reasonably accounted for thereafter, and there were six empty shells, we don't know whether the officer had already been hit by the fatal bullet at the time he exclaimed, nor do we know any of the circumstances which surrounded the parties at that time. And other circumstantial evidence on this point, as it is, is susceptible of at least two inferences, thus probative of none. For example, a paraffin test showed powder burns on the right hand of the officer. They could have occurred either by the officer drawing his gun and firing the first shot (the erring bullets were not found), and thereafter appellant could have wrestled the gun from him and fired the remaining shots; or the nitrate could have gotten on the officer's hand from one or another of the shots fired by the appellant, if we assume that the appellant somehow got the gun first and was the felonious aggressor from the beginning. We don't know, either, what, if any, other threats, real or apparent, were made by the officer which may have motivated or precipitated a specific intent to kill in the mind of appellant, *60 and, if so, when they occurred. In short, we again say that fixing a point of time at which a specific intent to kill was formed can only be left to speculation. We conclude, therefore, that the evidence is insufficient, as a matter of law, to support a finding of premeditation.

IV.
We are left, now, with the question of whether the evidence will support a finding of second degree murder. By returning a verdict of first degree murder it necessarily follows, of course, that the jury found as true all the necessary elements of second degree murder which is included in first degree. Thus, the jury determined that the appellant killed the deceased by an act imminently dangerous evincing a depraved mind.[10] There was no justification, as we have seen, for concluding that such killing was from a premeditated design to kill; but we are of the opinion that there was competent evidence from which the jury could have found, and necessarily did find, the elements of second degree murder.
That the killing was by an imminently dangerous act cannot be questioned. And the depravity of mind required in second degree murder has been equated with malice in the commonly understood sense of ill will, hatred, spite, or evil intent.[11] The evidence in this case in support of a conclusion of malice, in this sense, is overwhelmingly patent: the fact that the officer had been disarmed; the persistent efforts of the appellant to pursue the attack, even after the officer had apparently signaled a willingness to break off the affray by shouting "No ! No !"; (although, as we have observed, this could have been before or after the fatal shot was fired, and thus not probative of premeditation); the fact that the officer was shot twice in the back; the firing of the gun until all bullets were spent and, thereafter, pulling the trigger several times on empty cylinders; and appellant's immediate res gestae exclamation to Officer Lee acknowledging the killing, to wit: "Yes, G____ D____ it, I killed him.", from which a specific intent to kill may be inferred (although the time of its formation, as pointed out, is undeterminable). These facts all combined to furnish more than sufficient basis for a finding of the requisite depravity of mind to support second degree murder as included in the indictment.
There being no reason appearing of record, therefore, why a new trial should be had, and pursuant to § 924.34, F.S.A., providing as follows:
"In a case where the offense is divided into degrees * * * and the appellate court is of the opinion that the evidence does not prove the degree * * * of which the defendant is found guilty, but does establish his guilt of some lesser degree * * *, then the appellate court shall reverse the judgment of the trial court with directions to the trial court to enter judgment for such lesser degree * * * and pass sentence accordingly, unless some other matter or thing appearing in the record makes it advisable that a new trial be had.",
we pursue the course followed by our Supreme Court in Douglas v. State, supra, and reverse the judgment and sentence entered and imposed on murder in the first degree; and we remand the case to the trial court with directions to enter a judgment against the appellant of guilt of murder in the second degree and impose the appropriate sentence in accordance with law.
Reversed, and remanded with directions.
LILES, C.J., and HOBSON, J., concur.
NOTES
[1] (1911), 61 Fla. 50, 54 So. 360.
[2] See Galvin v. State, 6 Cold. 283 (Tenn.), cited with approval by the Supreme Court of Florida in Roberson v. State (1901), 43 Fla. 156, 29 So. 535, at p. 539.
[3] Timmons v. State (Fla. 1952), 57 So.2d 36.
[4] See Alday v. State (Fla. 1952), 57 So.2d 333; Presley v. State (1918), 75 Fla. 434, 78 So. 532, and Roberson v. State, supra.
[5] The same analogy was made in Timmons v. State, id.
[6] 82 Va. 554.
[7] Douglas v. State (1942) 152 Fla. 63, 10 So.2d 731.
[8] Polk v. State (Fla.App. 1965), 179 So.2d 236; Mackiewicz v. State (Fla. 1959), 114 So.2d 684, and McCutchen v. State (Fla. 1957), 96 So.2d 152.
[9] See e.g., Mackiewicz v. State, id.
[10] § 782.04 par. 2 F.S.A.
[11] Bega v. State (Fla.App. 1958), 100 So.2d 455; Huntley v. State (Fla. 1953), 66 So.2d 504, and Ramsey v. State (1934), 114 Fla. 766, 154 So. 855.