269 So.2d 70 (1972)
Leslie Joseph WEINSTEIN, Appellant,
v.
STATE of Florida, Appellee.
No. P-430.
District Court of Appeal of Florida, First District.
November 7, 1972.
Rehearing Denied December 6, 1972.
*71 Albert J. Datz, of Datz, Jacobson & Dusek, Jacksonville, for appellant.
Robert L. Shevin, Atty. Gen., and Richard W. Prospect, Asst. Atty. Gen., for appellee.
RAWLS, Judge.
Leslie Joseph Weinstein appeals a judgment of conviction of the crime of manslaughter.
Appellant poses two justiciable issues, viz.:
1. The Court erred in entering its order denying defendant's motion to suppress evidence of confessions and statements.
2. Where circumstantial evidence is not inconsistent with the accused's exculpatory version of the homicide, is the evidence sufficient to sustain the guilty verdict?
On New Year's Eve, defendant Leslie Weinstein (age 17); his sisters, Nannette (age 16), Molly (age 13), and Barry (age 7); and a friend were at the Weinstein family residence in St. Augustine, Florida. Their parents were attending a New Year's Eve party at the home of a friend. Of import was the fact that a new white shag carpet had recently been installed in the Weinstein living room and the Weinstein children had been admonished by their parents to keep it clean. Kevin Brown who had borrowed his father's Volkswagen van, along with three friends (the four boys were teen-agers), arrived at the Weinstein home around 9:00 p.m. for the purpose of talking with Nannette. Defendant who had been in the garage painting his jeep entered the breakfast room to get a cold drink and observed two of the teenage boys playing tag with his little sister. At this time he asked the visiting boys if they lived in a barn and told them to take their shoes off or get the hell out. One of the boys left the house immediately and the other three followed shortly thereafter.
The boys all got into the van to go to the Point (Vilano Beach), but instead of immediately driving to the Point, the driver of the van, David Carter, proceeded in the opposite direction past the front of the Weinstein home. At this time David stopped the van and Kevin and Nannette talked for a short while. The boys could see defendant at the end of the driveway painting his jeep, but said nothing to him. They then proceeded to the next corner, turned around, drove back in front of the Weinstein home where the van was slowed down and David shouted at defendant: "Let your fucking hair grow." The boys then drove to the beach and discussed among themselves and friends "getting back" at defendant for throwing them out of the Weinstein home. They were admittedly mad at defendant and discussed beating him up, but decided against it. In about half an hour the boys decided to ride by defendant's house and explode an M-80 firecracker.[1] They then left the beach and again drove the van slowly in front of the *72 Weinstein residence at around 11:00 p.m. and tossed a lighted M-80 firecracker into the Weinstein yard. The M-80 exploded with a loud noise. About 20 seconds later another "firecracker-like" explosion was heard and a bullet entered the rear of the van, striking and killing one of the teenage boys, Kevin Brown.
After adducing the preceding testimony from the boys who were riding in the van, the State continued the presentation of its case by calling defendant's sister, Molly Weinstein. She testified that when the boys left the house they first drove west, turned around, came back and slowed down in front of the house, and one of the boys hollered at defendant: "... grow your hair longer, you bastard"; whereupon her younger sister, Barry (in the garage with defendant) started crying. At this point defendant went into the house and got his gun. Molly further stated that she later saw the van going east in front of the house where it again slowed down and an object that sparkled like a firecracker was thrown out on the grass near the driveway. Defendant ran to the curb with his rifle in his hand pointed "down toward the ground," the M-80 exploded, defendant jerked and the rifle he was holding discharged. This witness testified positively that defendant did not put the rifle to his shoulder. We pause here to note that Molly Weinstein was called by the State as its witness. The State did not assert at any point that she was an adverse witness, thus the State is bound by her testimony.
The State concluded its case by calling to the stand Police Officer O'Loughlin. At approximately 11:30 p.m. (soon after the incident occurred) Officer O'Loughlin went to the Weinstein home to investigate Kevin's death. The officer had known defendant since he was a small boy and at all times displayed a benevolent attitude toward him. The officer testified that defendant told him an explosive had been thrown from a van and he, defendant, had shot into the ground with a shotgun. The officer then asked defendant as to the whereabouts of the shotgun and was told it was in the house. Thereafter, defendant was placed under arrest by the officer and was advised of his right to remain silent, but was not advised of his right to counsel or that any thing he said could be used against him. As the officer and the defendant went into the house, the defendant asked: "How bad is it?" The officer replied that one of the boys was dead. The defendant fainted. Upon being revived by the officer, defendant told him that he had lied about the shotgun and its location. The defendant further revealed that he had shot a rifle and that he would show the officer where it was hidden.
We first consider defendant's contention that the court erred in not suppressing evidence of confessions and statements made by him to Police Officer O'Loughlin. The dictates of Miranda v. Arizona[2] were clearly violated when the officer failed to advise defendant that anything he said could be used against him and that he had the right to legal counsel. Miranda warnings are not confined to hardened criminals. The Supreme Court of the United States has in a legion of cases engrafted these warnings upon the Federal Constitution for the benefit of all citizens, including a minor of 17 years of age. The warnings were not given in this case, and therefore the admissions made by defendant to Police Officer O'Loughlin were inadmissible. We hold that the trial court erred in allowing these admissions to be presented to the jury.
We next turn our attention to whether the evidence is sufficient to sustain the verdict of guilty. In contending that there was substantial evidence to convict defendant, the State points out:
"There was testimony that Appellant was provoked with the decedent and his *73 three friends' attitudes earlier that evening over an inconsequential matter. Evidence showed that Appellant intentionally placed his high-powered hunting rifle in the garage near himself and his two little sisters. A witness saw him holding the rifle near the street immediately after the fatal shot was fired... . Evidence showing that the bullet had been fired through the van indicated that the murderer had to be standing in the vicinity of the street, as was defendant... . The Appellant shot into the van knowing that he would probably kill someone, evincing a depraved mind regardless of human life, but not particularly caring who."
If the evidence in this record supported the foregoing argument contained in the State's brief, he would unhesitatingly affirm the judgment appealed. Such is not the case.
The evidence can be summarized as follows: (1) New Year's Eve defendant was the "man in charge" of his parents' home, his three younger sisters and another child; (2) he ordered, as he had a right to do, the four boys involved to leave the Weinstein home; (3) the four boys left the Weinstein home mad at defendant and angrily shouted an epithet at him; (4) the preponderance of the evidence shows that shortly after the M-80 exploded, another explosion (the rifle shot) was heard[3]; and (5) the second explosion was a shot fired by defendant from a rifle in his possession. The salient question is: Did the State establish a prima facie case by circumstantial evidence that Leslie "shot into the van knowing that he would probably kill someone"? We hold not.
In Mayo v. State[4] the Supreme Court considered a factual situation wherein the defendant had engaged in a "shoot-out" with a constable resulting in the constable's death. The surviving witnesses were defendant and his brother. The Supreme Court noted:
"The appellant's [defendant's] version of the immediate circumstances of the shooting itself as related above, was corroborated by his brother and others and was not contradicted in any material respect, except as to the total number of shots fired, which was variously stated as being from four to eight."
Other testimony reviewed by the court reflected animosity on defendant's part prior to the shoot-out towards decedent, thus establishing evidence of a circumstantial nature as to motive. The court then stated the well established rule applicable as:
"When circumstantial evidence is relied upon to convict a person charged with a crime, the evidence must not only be consistent with the defendant's guilt but must also be inconsistent with any reasonable hypothesis of his innocence... . And evidence which leaves one with `nothing stronger than a suspicion' that the defendant committed the crime is not sufficient to sustain a conviction... .
"Circumstantial evidence is never sufficient to support a conviction, where, after there is assumed all to be proved which the evidence tends to prove, another hypothesis still may be true, because it is the actual exclusion of each other hypothesis which clothes mere circumstances *74 with the force of proof. Thus evidence leaving uncertain which of several hypothesis may be true, or establishing only a probability favoring one hypothesis rather than another, cannot be equal to proof of guilt, no matter how strong the probability may be.
* * * * * *
"... The evidence in the record and the lawful inferences which may be drawn from it are wholly insufficient to sustain the judgment appealed from."
We find an analogous factual situation in Sharp v. State[5] which involved a manslaughter conviction. There defendant, a large man weighing approximately 240 pounds, attempted to quiet a fracus outside his bar. He first went out and warned the belligerent group to quiet down or leave. When this was unavailing, he went back into the bar and came out with a shotgun. Defendant testified that "he stumbled, and that the gun fired accidentally." (Emphasis supplied.) The appellate court concluded that after a close study of the record the State had failed to prove its case.
As pointed out in the factual recitation, the State is bound by its witness and the State's version coincides with defendant's version. Under the cited judicial authority of our State and the facts of this case, the trial judge erred in not directing a verdict for defendant at the time the State rested its case.
The judgment of conviction is reversed with directions to discharge the defendant.
SPECTOR, C.J., concurs.
WIGGINTON, J., dissents.
WIGGINTON, Judge (dissenting).
I am unable to agree that the rule of law relied upon by the majority opinion for reversal of the judgment appealed herein is applicable to the undisputed facts in this case and must therefore dissent.
The majority opinion detects error in the admission into evidence of an incriminating statement made by appellant to the police officer at the scene of the crime for the reason that the Miranda warnings were not fully and completely given appellant at that time. It is clear from the record that in the course of the police investigation appellant voluntarily stated to the officer that he had shot into the ground with his shotgun. At that point the course of the investigation had not focused on appellant as a suspect nor was appellant in police custody. The officer immediately thereafter placed appellant under arrest and admonished him to remain silent and make no further statement concerning the incident. In addition, a portion but not all of the Miranda warnings were given appellant at that time. It was thereafter that appellant, while still inside the sanctuary of his own home, voluntarily made another statement to the officer regarding his shotgun and its location. This statement was not made in response to any question or further interrogation by the officer but was made freely and voluntarily by appellant of his own volition. It is this statement which the majority opinion holds to have been erroneously admitted in evidence over appellant's objection.
*75 The books are replete with decisions of this and other appellate courts of Florida holding that gratuitous statements freely and voluntarily made by a suspect after arrest and not in response to in-custody police interrogation are admissible whether or not the Miranda warnings were given. The statement received in evidence was therefore wholly admissible and forms no valid basis for reversal.
It is my further view that whether the evidence was sufficient to sustain the verdict involved disputed issues of material facts which were properly submitted to and resolved by the jury. Only by indulging the cardinal sin of substituting our judgment for that of the jury can a reversal of the judgment on this ground be sustained. This I am not willing to do.
NOTES
[1] Patterned after an army ordinance simulator to simulate artillery fire in recruit training.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] Two of the boys in the van testified the time as:

"About twenty seconds."
[4] Mayo v. State, 71 So.2d 899, 900, 904 (Fla. 1954); also see Holton v. State, 87 Fla. 65, 99 So. 244, 245 (1924), which held: "The circumstances relied upon by the state to contradict the defendant's story are not so conclusive of the falsity of that story as to have warranted the conviction."
[5] Sharp v. State, 120 So.2d 206 (2 Fla. App. 1960); also see Neveils v. State, 145 So.2d 883 (1 Fla.App. 1962); and Getsie v. State, 193 So.2d 679 (4 Fla.App. 1967).