344 So.2d 1317 (1977)
William MANUEL, Appellant,
v.
STATE of Florida, Appellee.
No. 76-1493.
District Court of Appeal of Florida, Second District.
April 27, 1977.
*1318 Jack O. Johnson, Public Defender, and P. Douglas Brinkmeyer, Asst. Public Defender, Bartow, for appellant.
Robert L. Shevin, Atty. Gen., Tallahassee, and Davis G. Anderson, Jr., Asst. Atty. Gen., Tampa, for appellee.
OTT, Judge.
Appellant was convicted of second degree murder. We reverse and remand for the imposition of a sentence of manslaughter for reasons hereinafter stated.
On the night of March 26, 1976, Robert Jackson, 10, was playing with Wendell Elliott, 13, in the vicinity of Janie Mae Hayes' house. The house fronted on Ohio Street in Lake Wales. The boys were playing "chase"  a game which rewards silence and stealth. They were playing so quietly and the night was so dark that a woman sitting on a nearby porch was unaware of their presence.
Earlier that night, Louise Manuel, wife of the appellant, had come to Ms. Hayes' house and accused a lodger, Ella Mae Kindrick, of having an affair with her husband. An argument ensued, after which Mrs. Manuel left the area.
The appellant was in a bar when he heard that his wife had been involved in a tiff. He obtained his .32 caliber pistol and began walking down Ohio Street toward the Hayes house. Upon reaching the area in front of the Dunlap house  two doors from the Hayes house  Manuel stopped walking when he saw Ella Mae Kindrick on the Dunlap front porch. He said to her, "Who's doing this to my wife?" ... "Who's that messing with my wife?" He then fired a single shot into the ground.
After firing the first shot, Manuel proceeded to a lightpost (the light was broken) in front of the house between the Dunlap and Hayes houses. At this point, Wendell Elliott, having heard the shot, ran from the rear of the Hayes house to a point about three feet from Manuel. Once there, Wendell called for Robert, but received no answer. The record contains no indication that Wendell attempted to warn Manuel that Robert was in the area.
About three minutes after firing the first shot, Manuel fired another shot. According to Ms. Kindrick, from her vantage point on the Dunlap porch she could not tell exactly in which direction Manuel had pointed the *1319 pistol when he fired the second shot. On direct examination, Wendell Elliott testified that he could not tell at what, if anything, Manuel was aiming. On cross-examination, however, Wendell testified that the gun was pointed in the general direction of an area on the far side of Ms. Hayes' front yard where a trash barrel and other garbage containers were located. Nothing in his testimony indicated he could actually see the trash barrel and other garbage containers. Nothing in his testimony indicated he knew where Robert Jackson was at the time the second shot was fired.
The deputy sheriff who took Manuel into custody testified that Manuel asked about Jackson's condition and stated that he had not intended to hit the boy and was sorry about it. According to this deputy, Manuel did not indicate whether or not he knew the boy was in the area, but did say that "he knew he hit the boy when he shot" and that "the boy got in the way."
The testimony was uncontradicted that Ohio Street was very badly lit, especially in the area where the boys were playing. A police photographer who arrived soon after the shooting testified that one could not see where to walk without a flashlight.
The record is somewhat sparse with regard to Manuel's mental state. The deputy who took Manuel into custody testified that Manuel stated that "he had got his pistol to try to protect his wife, stop the fight, keep anybody from hurting her."
The statute governing murder in the second degree, Section 782.04(2), Florida Statutes, provides in relevant part:
The unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual, shall be murder in the second degree... .
The Florida Standard Jury Instruction for murder in the second degree provides as follows:
An act is one imminently dangerous to another and evincing a depraved mind regardless of human life if it is an act (or a series of acts) which
1. a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another;
2. is done from ill will, hatred, spite or an evil intent, and
3. is of such a nature that the act itself indicates an indifference to human life.
Number 2 above amounts to what is frequently termed malice. The depravity of mind required in second degree murder has been equated with malice in the commonly understood sense of ill will, hatred, spite or evil intent. Ramsey v. State, 114 Fla. 766, 154 So. 855, 856 (1934); see Huntley v. State, 66 So.2d 504, 507 (Fla. 1953); Turner v. State, 298 So.2d 559, 560 (Fla. 3d DCA 1974); Bega v. State, 100 So.2d 455, 457 (Fla. 2d DCA 1958).[1]
Within the category of second degree murder there exist varying gradations of cases. The reason for this is that some acts are simply more depraved than others. For example, in Weaver v. State, 220 So.2d 53 (Fla. 2d DCA 1969) the court found the evidence to overwhelmingly support a finding of malice. In Weaver, the victim was a police officer. He was responding to the scene of a domestic dispute at the Weaver household. When Weaver resisted the officer's illegal attempt to enter his home, the officer maced Weaver. Weaver then disarmed the police officer, pursued him, ignored the officer's pleas for mercy, expended all the bullets in his gun in shooting the officer in the back and made an immediate res gestae exclamation acknowledging the killing. The court found these facts furnished *1320 more than a sufficient basis for a finding of the requisite depravity of mind. See Luke v. State, 204 So.2d 359 (Fla. 4th DCA 1967).
Another "strong" case is that of Grissom v. State, 237 So.2d 57 (Fla.3d DCA 1970). In Grissom, the defendant, a junior high school student, was disciplined by a teacher for a rule violation. Upon being disciplined, the defendant threatened to return and kill the teacher. A short time later he did return armed with a handgun and fired two shots at the teacher, wounding but not killing him. While fleeing the building after shooting the teacher, he fired one shot up a stairway in the school building. That shot struck and killed a student standing on the stairs.
Second degree murder convictions were also upheld in cases involving the pointing of a weapon at a vital area of the body before the weapon discharged. In Edwards v. State, 302 So.2d 479 (Fla.3d DCA 1974) the court found that the act of the defendant in pointing his gun at the victim's head, waiting until the victim had taken three steps backward, and then firing the gun, to be both depraved and imminently dangerous. See State v. Bryan, 287 So.2d 73 (Fla. 1973).
In Hines v. State, 227 So.2d 334 (Fla. 1st DCA 1969), the defendant had pointed a shotgun at the head of the deceased. The defendant stated that he "had a gun" and that she (the deceased) "should go out ... and act like a squirrel and if he killed her... it wouldn't be no accident." The gun discharged striking the deceased in the face and killing her. The court found that even if it accepted the defendant's contention that the gun had fired upon closing the breach that such an act committed while a gun is purposely pointed at the head of another from a very short distance certainly implied malice.
The instant case contrasts with the "pointed gun" cases in that Manuel pointed his gun in a direction (toward the garbage area) where one would think a shot could not result in harm to any person. In addition, the lack of any substantial evidence of malevolence directed toward any person strongly suggests to this court that Manuel's conduct, while certainly culpable and inexcusable, falls far short of malice.
The statute governing manslaughter, Section 782.07, Florida Statutes, provides in relevant part:
The killing of a human being by the ... culpable negligence of another, without lawful justification .. . shall be deemed manslaughter.
The Florida Standard Jury Instruction for manslaughter defines culpable negligence as follows:
Culpable negligence is negligence of a gross and flagrant nature and consists of more than a mere failure to use ordinary care. Culpable negligence is consciously doing an act or following a course of conduct which any reasonable person would know would likely result in death or great bodily injury to some other person, even though done without the intent to injure any person but with utter disregard for the safety of another.
In Savage v. State, 152 Fla. 367, 11 So.2d 778, 779 (1943), the court defined culpable negligence as that conduct which showed a
... gross and flagrant character, evincing reckless disregard of human life or of the safety of persons exposed to its dangerous effects; or that entire want of care which would raise the presumption of indifference to consequences; or such wantonness or recklessness or grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others, which is equivalent to an intentional violation of them.
See Preston v. State, 56 So.2d 543, 544 (Fla. 1952); Chieves v. State, 328 So.2d 264, 265 (Fla. 1st DCA 1976); Getsie v. State, 193 So.2d 679, 681-82 (Fla. 4th DCA 1966).
In the manslaughter area, one distinct line of cases involves accidental shootings in which manslaughter convictions were not upheld. As with the second degree murder *1321 cases, these "accident" cases are not all alike; some illustrate more serious and reprehensible conduct than do others. For example, the Getsie case involved an auxiliary policeman who on the day after Christmas, in attempting to sit on his wife's lap, accidently shot her with a gun which she had given him as a present the day before. Another "totally accidental" case was that of Walsingham v. State, 272 So.2d 215 (Fla. 2d DCA 1973). There, the defendant was holding a rifle on his lap in his bedroom while examining it. The rifle accidentally discharged. The bullet passed through a door and a wall and eventually struck one of defendant's children, killing him. See Weinstein v. State, 269 So.2d 70 (Fla. 1st DCA 1972) (firecracker explosion caused defendant, holding a rifle, to jerk upward and discharge the rifle).
Two other "accident" cases, a bit stronger on the facts, were Parker v. State, 318 So.2d 502 (Fla. 1st DCA 1975) and Sharp v. State, 120 So.2d 206 (Fla.2d DCA 1960). In Parker, the defendant was "fooling around" by waving his pistol around in the cab of a moving truck. At one point, he waved the pistol past the decedent's head when it went off. The fact that the defendant had the hammer positioned in the safety notch and believed the gun would not fire was considered an important factor.
In Sharp, the defendant intentionally pointed a loaded shotgun in the direction of a crowd for the purpose of restoring order. He then stumbled and the gun fired accidently, killing a man. An important factor in the defendant's not being convicted was his bad leg which apparently precipitated the stumbling and resultant firing of the gun.
One step beyond the "accident" cases are those in which the actual shooting was certainly accidental, but the act fits within the culpable negligence standard. In Williams v. State, 336 So.2d 1261 (Fla. 1st DCA 1976), a conviction for manslaughter was upheld. In that case there had been a bar fracas in which the appellant had been involved. During a lull in the fighting a vehicle in which the victim was riding arrived at the bar. When the driver of the vehicle pulled a shotgun out of his trunk the appellant  observing this  took his shotgun out of his truck and held it pointed toward the ground. As he shifted his grasp the shotgun discharged.
In McBride v. State, 191 So.2d 70 (Fla. 1st DCA 1966) a conviction for manslaughter was also upheld. The court found that the defendant "needlessly [had] on his person a deadly weapon which he brandished . . in a careless and reckless manner." The court stated that the defendant "set the stage for the tragedy which ultimately followed (an accidental shooting) even though he may have had [no] intention of killing the decedent." 191 So.2d at 71. See Dolan v. State, 85 So.2d 139 (Fla. 1956).
It is submitted that the facts in the instant case, although clearly indicating more culpable conduct than the facts of the non-manslaughter "accident" cases, supra, are not sufficient to warrant a conviction for second degree murder. Rather, if the McBride or Williams facts do not fall within second degree murder, i.e., they do not make out a prima facie case of a depraved mind, then it is inescapable that the facts in the instant case fall far short of second degree murder. In the instant case there was no evidence that the appellant either observed the victim or had any notice (actual or constructive) of his possible presence.
Thus, the noiseless playing of the victim, the inky blackness of the night and the lack of demonstrated ill will on the part of the appellant point more toward culpable negligence than the evincing of a depraved mind regardless of human life.
REVERSED and REMANDED.
HOBSON, Acting C.J., and SCHEB, J., concur.
NOTES
[1] "The legal and technical sense of the word `malice' differs from its sense in ordinary or common speech. In the technical sense it is a term of art importing wickedness and excluding a just cause or excuse... . Malice in law refers to that state of mind which is reckless of law and of the legal rights of the citizen in a person's conduct toward that citizen." Ramsey, supra, 154 So. at 856.